*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0225p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

HOFIT JENKINS,
 *Petitioner-Appellant/Cross-Appellee,*

 *v.*

AVRAHAM JENKINS and KLARIS JENKINS,
 *Respondents-Appellees/Cross-Appellants.*

Nos. 08-3534/3663

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 08-00037—Thomas M. Rose, District Judge.

Argued: December 11, 2008

Decided and Filed: July 1, 2009

Before: KENNEDY, BATCHELDER, and DAUGHTREY, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Frederick J. McGavran, FROST BROWN TODD LLC, Cincinnati, Ohio, for Appellant. Shawn P. Hooks, HOLZFASTER, CECIL, McKNIGHT & MUES, Dayton, Ohio, for Appellees. **ON BRIEF:** Frederick J. McGavran, FROST BROWN TODD LLC, Cincinnati, Ohio, for Appellant. Shawn P. Hooks, HOLZFASTER, CECIL, McKNIGHT & MUES, Dayton, Ohio, for Appellees.

 DAUGHTREY, J., delivered the opinion of the court, in which BATCHELDER, J., joined. KENNEDY, J. (pp. 12-18), delivered a separate dissenting opinion.

───────────────

**OPINION**

───────────────

 MARTHA CRAIG DAUGHTREY, Circuit Judge. The petitioner, Hofit Jenkins, appeals from the district court's denial of her petition filed pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, seeking the "return" of her now-five-year-old son, Orin, to her custody in Israel. Under the Abduction Convention, as

1

implemented by Congress through the International Child Abduction Remedies Act (ICARA), 42 U.S.C. §§ 11601-11611, return is the remedy for a child's "wrongful removal to or retention" in another country in violation of the rights of custody of the petitioning parent under the law of the state in which the child was "habitually resident" immediately before the removal. *See* Hague Abduction Convention, Article 3. In this case, Orin and his parents, Hofit and Avraham Jenkins, were living in Dayton, Ohio, after relocating to the United States from their native Israel because of Avraham Jenkins's job. The district court noted that Orin was *allegedly* wrongfully retained in this country by his father on the date that his mother, the petitioner here, voluntarily returned to Israel, leaving the child behind with his father and his paternal grandparents. The district court concluded, however, that both parents had been exercising their mutual rights of custody at that time, "under the law of the State [Ohio] in which the child was habitually resident," that Orin's father was therefore not "in breach of [Hofit's] rights of custody," and that her petition for the child's "return" should be denied. *Id.*

We conclude that the petitioner failed to establish by a preponderance of the evidence, as required by 42 U.S.C. § 11603(e)(1)(A), that there was an actual "removal or retention" by Orin's father or that the alleged retention was "wrongful." It therefore follows that the Abduction Convention cannot be successfully invoked in this case and that the petition filed by Orin's mother should have been dismissed rather than denied. Because the result is, practically speaking, the same, we affirm the judgment of the district court.

### FACTUAL AND PROCEDURAL BACKGROUND

Orin Jenkins's parents, Hofit and Avraham, were born in Israel during the mid-1970s. Hofit had lived her entire life there before moving to Dayton with her husband and son. Avraham, on the other hand, had moved from Israel to the United States with his mother and stepfather, Klaris and Dennis Jenkins, had spent his childhood here, and was educated in this country, although he had not obtained United States citizenship. As a result, when Avraham was later in Israel on vacation, he was detained by Israeli officials and drafted as an Israeli citizen into the Israeli Defense Force. While in the military, he met Hofit and they married in late 2002. Orin was born to the couple in Haifa on April 25, 2004.

In the immediate aftermath of Orin's birth, the family lived in Tirat Carmel in the Haifa district of Israel. The Jenkinses' home was a short distance from that of Hofit's parents, and Hofit's father brought breakfast food for Orin every morning before driving Hofit to work and Orin to his preschool. In the evenings, when Avraham worked late, Hofit's father would also pick Orin up from preschool and Hofit from work and drive them to his home until it was time for Orin to go to bed. Orin's grandfather described the young boy as happy and testified that Orin regularly played with the other children in the neighborhood, even though Orin could not have been more than two years old at the time.

Eventually, at the end of 2006 or in early 2007, Avraham was offered a position with his company in the United States for a three-year, renewable term at a salary "approximately three and a half times as much as what [he] was making in Israel." After Hofit had another in a series of altercations with her mother, the couple agreed to accept the generous employment offer and move to the United States. Consequently, Hofit quit her secretarial job in Israel, the couple terminated the lease on their residence, and Hofit and Avraham sold and gave or threw away all the belongings that they did not intend to take with them to America. On April 1, 2007, Hofit, Avraham, and Orin moved temporarily into Klaris and Dennis Jenkins's home in a suburb of Dayton, Ohio, until they could obtain a home of their own.

Almost immediately, Hofit and Avraham went about the business of normalizing their lives in their new surroundings. On April 17, 2007, the couple enrolled Orin in Hillel Academy, where Klaris taught Hebrew, so that the young boy could make new friends and learn English. According to testimony offered by Klaris, Orin adjusted well to school, made new friends, and attended synagogue with her each week. The boy eventually changed schools but continued to do well and meet with friends at synagogue and at the numerous children's birthday parties held in the Jewish community in Dayton. Orin also accompanied family members on frequent outings – for example, to a nearby park and to the Air Force museum.

By the end of May 2007, Hofit and Avraham were ready to move into a home of their own. Initially, Hofit accompanied Klaris on the home search and, after locating a suitable dwelling for rent, Hofit inquired of the realtor whether she and Avraham could

eventually purchase the home. The petitioner also asked questions regarding painting and redecorating their new house, and she purchased several thousand dollars worth of furniture to fill it.

In July 2007, the couple was forced to return to Israel for more than three weeks to obtain certain documents related to their visa applications. While they were gone, Klaris continued to care for Orin; indeed, when Klaris first expressed some reluctance to stay with Orin because of pre-existing plans, Hofit confronted her mother-in-law with the promise that Klaris had made to provide babysitting services "whenever needed." During Hofit and Avraham's absence, Klaris made sure that Orin was able to participate in all his usual activities and even used that opportunity to potty-train the then-three-year-old boy because Hofit had not done so previously. Klaris testified that by that time, Orin's English skills had advanced to the point that the boy's grasp of English was the same as his facility with Hebrew and that his English skills were already appropriate for an American child of that age.

By the time Hofit and Avraham returned to the United States in August 2007, the couple's relationship was deteriorating, in part because of Hofit's confession to both Klaris and to Klaris's husband, Dennis, that she had "cheated" on Avraham with a "young man from Israel." Hofit claimed that Avraham then hid Orin's passport from her and became both emotionally and sexually abusive. Finally, on September 22, 2007, in response to Hofit's requests to return to Israel to live, Avraham drove Hofit to the airport and purchased a ticket for her to leave Dayton. Even though Avraham refused to allow Orin to go with her, Hofit nevertheless flew to New York and from there on to Israel.

Once in Israel, Hofit instituted divorce proceedings against Avraham and filed a petition with the Israeli Central Authority for the return of Orin under the provisions of the Hague Abduction Convention. Because Hofit was pregnant with her second child at the time scheduled for the evidentiary hearing in April 2008, arrangements were made to have Hofit and her witnesses testify by telephone from the United States Consulate in Israel, with the aid of an interpreter. At the conclusion of the three-day hearing, the district court ruled:

> The date of the alleged wrongful detention of Orin by Avraham was
> September 22, 2007. At that time, both Hofit and Avraham had and were
> exercising their custody rights. Orin's "habitual residence" on September

22, 2007, was in the U.S. Therefore, Hofit's Petition for the return of Orin Jenkins to Israel is DENIED.

Hofit now appeals that decision, challenging the "habitual residence" finding and various underpinnings of that conclusion. Avraham and Klaris cross-appeal, contending that certain expert testimony offered by the petitioner should not have been allowed into evidence.

### *DISCUSSION*

The Hague Convention on the Civil Aspects of International Child Abduction[1] was adopted by signatory nations "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001) (quoting the Hague Abduction Convention preamble). To those ends, the Convention "is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich v. Friedrich* (*Friedrich II*), 78 F.3d 1060, 1064 (6th Cir. 1996).

Pursuant to Article 3 of the Convention:

The removal or retention of a child is to be considered wrongful where –

a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone under the law of the State in which the child was habitually resident immediately before the removal or retention;

and

b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

---

[1]The 1980 Abduction Convention, was actually the first of three Hague Children's Conventions. It was followed by the Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption (the Adoption Convention) and the Convention on Jurisdiction, Applicable Law, Recognition, Enforcement and Co-operation in Respect of Parental Responsibility and Measures for the Protection of Children (the Jurisdiction Convention).

In this dispute, the petitioner and the respondents concede that both Hofit and Avraham Jenkins were exercising custodial rights over Orin on September 22, 2007, the date that Hofit flew back to Israel. She nevertheless contends that because she was not permitted to take the child with her, Orin was "wrongfully retained" by his father in Ohio and should be "returned" to her custody in Israel. In support of this proposition, Hofit offered the testimony of an Israeli lawyer, Oded Sa'ar, that under the laws of Israel, "the mother [is] favored as the custodian of the child." Hofit argued, therefore, that Avraham breached her custodial rights when he refused to let Orin to return to Israel with her.

There are several legal problems with this claim. We note, first, that the record is devoid of any support for this statement. In fact, the child custody laws of Israel and Ohio appear to be functionally equivalent.[2] Second, the claim is directly contradicted by the petitioner's assertion in her "verified petition for return of child." Attached as Exhibit D to that petition is a Convention form entitled Request for Return of Abducted Child. In the written request, the petitioner recites in Section V ("factual and legal background justifying this request"), subsection 2 (setting out "[t]he requesting party['s] . . . Custodial Rights"), as follows:

> Pursuant to Israel's Capacity and Guardianship Law 1962, parents are the joint guardians of their minor children, which include (*sic*) the right to

---

[2]Pursuant to sections 14 and 15 of the Capacity and Guardianship Law of the State of Israel, for example:

> 14. Parents shall be the natural guardians of their minor children.
> 15. The guardianship of the parents shall include the duty and the right to take care of the needs of the minor, including his education, studies, vocational and occupational training and work, and to preserve, manage and develop his property; it shall also include the right to the custody of the minor, to determine his place of residence and the authority to act on his behalf.

Capacity and Guardianship Law, 5722-1962, S.H. 120. Likewise, section 2111.08 of the Ohio Revised Code provides, in relevant part:

> The wife and husband are the joint natural guardians of their minor children and are equally charged with their care, nurture, welfare, and education and the care and management of their estates. The wife and husband have equal powers, rights, and duties and neither parent has any right paramount to the right of the other concerning the parental rights and responsibilities for the care of the minor or the right to be the residential parent and legal custodian of the minor, the control of the services or the earnings of such minor, or any other matter affecting the minor . . . .

custody and to determine the child's place of residence. Therefore, the parents have joint custody and joint guardianship, including the joint right to determine the children's place of residence.

Finally, and of paramount importance, we note that although the opinion offered by the petitioner's expert may be relevant to the question of who, eventually, is to be awarded legal custody of Orin, it was irrelevant to the question before the district court, *i.e.*, the jurisdiction in which the custody award should be determined. *See* 42 U.S.C. § 11601(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims."). *See also* Linda Silberman, *Interpreting the Hague Abduction Convention: In Search of a Global Jurisprudence*, 38 U. C. Davis L. Rev. 1049, 1054 (2005) ("The 'return' remedy can be thought of as a 'provisional' remedy because it does not dispose of the merits of the custody case – additional proceedings on the merits of the custody dispute are contemplated in the State of the child's habitual residence once the child is returned there."). The district court undoubtedly gave the testimony of the Israeli lawyer only passing comment for just this reason, focusing instead on the dispositive issue: whether Orin had been wrongfully removed from his "habitual residence" as of September 22, 2007, or, if lawfully removed, whether he had then been wrongfully retained in the United States.

From our reading of Article 3 of the Convention, we conclude that there was no wrongful removal or retention, simply because (a) there was no "removal" – wrongful or otherwise – other than that resulting from the parents' mutual decision to relocate Orin from Israel to the United States, and (b) there was no "wrongful retention" of the child by Avraham, who had an equal right with Hofit to Orin's custody in the absence of a court order or judicial determination to the contrary. In refusing to let Hofit take Orin to Israel, Avraham may arguably have committed a breach of Hofit's "rights of access" to Orin,[3] but he did not commit a "breach of rights of custody . . . under the law

---

[3] Under the Convention, the remedy of return is available for a wrongful removal or retention but not for a breach of the right to access. Article 1 calls for the "prompt return" of children "wrongfully removed to or retained in any Contracting State" but provides only that the "rights of custody and of access under the law of one Contracting State" should be "effectively respected in other Contracting States." Convention, Article 1b. *See also* 42 U.S.C. § 11603(b) (contrasting a petition for the return of

of the State in which the child was habitually resident immediately before the [alleged] removal or retention." Hague Abduction Convention, Article 3.**4**

We conclude that the petitioner's failure to establish that Orin was either wrongfully removed or retained by Avraham effectively ends our review in this appeal. Nevertheless, we take the occasion to address the issue of Orin's "habitual residence" in view of the dissent's conclusion that resolution of this question requires a remand to the district court to examine the "strength of [Orin's] relationship with his prior habitual residence."

The parties have argued at length about the correctness of the district court's finding that Ohio was Orin's "habitual residence" at the time Hofit left the marital home to return to Israel. Unfortunately, neither the Hague Abduction Convention nor ICARA offers a comprehensive definition of the phrase "habitual residence." Moreover, the term has yet to be interpreted by the Supreme Court. We have stated clearly, however, "that habitual residence must not be confused with domicile. To determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions." *Friedrich v. Friedrich* (*Friedrich I*), 983 F.2d 1396, 1401 (6th Cir. 1993). *See also* Silberman, *supra*, at 1067. In doing so, our precedent requires that we consider a child's habitual residence to be "the nation where, at the time of [a wrongful removal or retention], the child has been present long enough to allow acclimatization, and where this presence has a 'degree of settled purpose from the child's

---

a child with a petition seeking "arrangements for organizing or securing the effective exercise of rights of access to a child"). Under Article 5a of the Convention, "rights of access" include "the right to take a child for a limited period of time to a place other than the child's habitual residence." Similarly, the term "rights of access" is defined by ICARA as "visitation rights." *Id.* at § 11602(7).

**4**The dissent insists that it was Avraham who breached Hofit's rights of custody by "unilaterally deciding" Orin's place of residence when he prevented his son's departure from Ohio. We find such an assertion to be an interesting but inaccurate gloss on the undisputed facts in this case. The family voluntarily left Israel to start a new life in the United States, and the record gives no indication that Hofit was anything other than a willing collaborator in that decision. In fact, testimony before the district court established that the final decision to move from Israel was made in significant part based on Hofit's desire to distance the family from her parents after a rift in her relationship with her mother. She then disrupted the family's newly established habitual residence by "unilaterally deciding" to return to Israel after causing a rift in her relationship with her husband.

perspective.'"  *Robert v. Tesson*, 507 F.3d 981, 993 (6th Cir. 2007) (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)).

In *Karkkainen v. Kovalchuk*, 445 F.3d 280 (3d Cir. 2006), the Third Circuit listed several factors that a court could consider in determining a child's habitual residence. In our opinion in *Robert*, we found many of those *Karkkainen* factors applicable to the dispute before us and noted:

> [T]he Third Circuit held that academic activities are among the most central . . . in a child's life and therefore highly suggestive of acclimatization.  The court also noted that social engagements, participation in sports programs and excursions, and meaningful connections with the people and places in the child's new country all point to the child being acclimatized.  Additionally, the court held that the fact that [the child] brought more personal belongings with her than usual, in anticipation that she would remain [in the United States] was evidence of a settled purpose to reside in the United States.

*Robert*, 507 F.3d at 996 (citations and internal quotation marks omitted).

The district judge did not clearly err in his factual finding in this matter that Orin, as of September 22, 2007, had become acclimated to life in Ohio.  His evaluation of the relevant factors of acclimatization discussed in *Robert* and *Karkkainen* indicated that the child was attending preschool in the United States and was, by all first-person accounts, doing well in that environment, having attained both Hebrew and English language skills commensurate with his age and learning opportunities.  Orin also enjoyed a weekly routine that involved visits to the Air Force museum in Dayton, frequent summertime visits to fountains in a nearby water park, weekly trips to the synagogue with his grandmother, and attendance at numerous birthday parties for young friends from both preschool and synagogue.[5]  Finally, the court accurately noted that *all* of Orin's personal

---

[5]We question both the factual and logical underpinnings of the dissent's treatment of this evidence.  First, the dissent discounts Avraham's evidence of Orin's acclimatization as information provided by interested parties – Avraham and Klaris.  Of course, Hofit's case for Orin's strong ties to Israel was also produced by interested parties – Hofit and Hofit's father.  Second, the dissent minimizes the importance of testimony that Orin regularly visited a synagogue, parks, and museums in Ohio by referencing "[t]he child's age and the fact that he had to be taken to such places."  Although the dissent describes our reliance on such information as less than justified, it is the dissent which then seeks to emphasize Orin's "close relationship with his extended family in Israel, especially . . . his cousins."  But Orin left Israel at age two, obviously too young to form meaningful relationships with his much older cousins.

belongings, clothes, and toys were in his home in Ohio, evidencing a "settled purpose" to reside in the United States from the child's perspective. Indeed, as noted in trial testimony, any belongings that the family could not bring with them from Israel to the United States had been sold, given away, or thrown away.

Despite overwhelming evidence that Ohio was Orin's habitual residence, the petitioner asserts – and the dissent appears to agree – that the district judge did not give sufficient deference to the unique Jewish heritage advantages offered by an upbringing in Israel when determining Orin's habitual residence.[6] In response to a similar argument proffered at trial, the district court concluded that, although it may be true "that Orin has a unique heritage as an Israeli Jew that can only be properly developed in Israel," such a consideration was not properly before the court in this litigation. Rather, "the Court is only to determine Orin's 'habitual residence' at the time of the wrongful removal and considerations of where Orin's heritage can properly be developed are not a part of this determination." In contrast, the ultimate decision concerning legal custody will, of course, take into consideration such factors as Orin's heritage, his future education, and which family associations are in his best interest. The only question properly before the district court in this dispute, however, was where that custody determination should be made.

The record reveals that the district court appropriately recognized the limits placed on the scope of its inquiry by the Convention and ICARA. Moreover, despite the dissent's contention to the contrary, there was no error in the district court's failure to engage in a more detailed comparison of the virtues of Orin's situation in Ohio with the possible advantages of life in Israel. As we noted in *Friedrich I*, "'wrongful removal' is a legal term strictly defined in the Convention" that "does not require an ad hoc

---

[6]In fact, the dissent argues that our comparison of living situations in *Robert* mandates that we do so in every "habitual residence" determination. It is true that we were forced into such an analysis in *Robert*. That case, however, presented a thorny factual impediment not found in this litigation. In *Robert*, the children alternated living in the United States and France for extended periods and maintained contacts and possessions in each country. Because Hofit and Avraham sold, gave away, or discarded all personal items the family possessed in Israel that were not to be taken to the United States, and because, at the time of the district court's decision, all of Orin's clothes, all of Orin's toys, all of Orin's furniture, indeed all of Orin's possessions, were in the United States and not in Israel, *Robert*'s comparative analysis is unnecessary – and indeed, inapposite – here.

determination or a balancing of the equities." *Friedrich I*, 983 F.2d at 1400. Indeed, such a balancing "would be contrary to a primary purpose of the Convention to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Id.* That observation is particularly relevant in the circumstances of the case before us, which suggest that Hofit was likely engaging in forum-shopping when she petitioned the court to declare Israel to be Orin's habitual residence because, as her expert witness testified, "[u]nder the law of Israel[,] the mother [is] favored as the custodian of the child."

It was this expert testimony that is the subject of the cross-appeal filed by Avraham and Klaris Jenkins. The respondents lodged an objection to it, arguing that the petitioner had failed to provide timely expert witness statements as required by Federal Rule of Civil Procedure 26(a)(2)(B) before Oded Sa'ar took the stand. They now contend that the district court erred in permitting Sa'ar to testify. However, appellate courts "review judgments, not statements in an opinion." *ASARCO, Inc. v. Sec'y of Labor*, 206 F.3d 720, 722 (6th Cir. 2000). Thus, "[a] party may not appeal from a judgment or decision in his favor, for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree." *Elec. Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 242 (1939). Because the district judge's ruling on the admissibility of Sa'ar's testimony was not determinative of the merits of the issue before the district court, we are without jurisdiction over that one adverse aspect of an otherwise favorable decision. The respondents' cross-appeal must, therefore, be dismissed.

For the reasons set out above, we conclude that Hofit Jenkins's petition should have been dismissed for failure to establish a claim under the Hague Abduction Convention, and we therefore AFFIRM the district court's judgment to the extent that it denies relief to the petitioner. Moreover, we DISMISS the respondents' cross-appeal for lack of jurisdiction to review the question presented.

---

**DISSENT**

---

KENNEDY, Circuit Judge, dissenting.  The Hague Convention on the Civil Aspects of International Child Abduction[1] ("Hague Convention") exists to ensure the prompt return of children wrongfully retained to the state of the child's habitual residence.  Hague Convention, Preamble.  According to the Convention, a retention is "wrongful" where:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Id.*, Article 3.  Although the word "retention" itself is not defined, the Hague Convention does define "rights of custody," and contrasts it with the mere "rights of access" for which the Hague Convention does not provide the remedy of the child's return:

> a) "rights of custody" shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;
>
> b) "rights of access" shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

*Id.*, Article 5.

---

[1] Although the title of the Hague Convention includes the word "abduction," the drafters did so only because of the word's "habitual use by the 'mass media' and its resonance in the public mind."  Elisa Perez-Vera, Explanatory Report ¶ 53, in 3 *Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction* 1069 (1982) ("Perez-Vera Report").  Indeed, there exists a "lack of correspondence between the title of the Convention and the terms used in [its] text."  *Id.*  The actual text of the Hague Convention refers to "removal" and "retention" and treats them symmetrically.

The district court looked to the Third Circuit's decision in *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006), for the following process in Hague Convention cases:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Id.* at 287. Using this formula, the district court concluded that the United States was the child's habitual residence, and so it denied Hofit's petition for return of the child to Israel.

The majority denies Hofit's petition on appeal, but it relies primarily on a different reason. According to the court, the retention was not wrongful in this case because Avraham "did not commit a 'breach of rights of custody . . . under the law of the State in which the child was habitually resident immediately before the [alleged] removal or retention.'" Maj. Op. at 7–8 (quoting Hague Convention, Article 3). The majority also concludes in dicta that the district court did not commit procedural error by failing to give any consideration to Israel as Orin's habitual residence. For the following reasons, I dissent.

## I.

Neither in the district court, nor on appeal did Avraham argue that he did not breach Hofit's right of custody. Even in denying Hofit's petition, the district court concluded that Hofit, as Orin's mother, had a "right of custody" under both Israeli and Ohio law. Yet the majority concludes that Avraham did not breach a right of custody of Hofit's. I believe that is incorrect.

The Hague Convention defines a "right of custody" in particular to include "the right to determine the child's place of residence." Hague Convention, Article 5. The majority readily admits that under both Israeli and Ohio law, as Orin's mother, Hofit had a right to determine the child's place of residence. Maj. Op. at 8. At the time of the

alleged retention, Hofit shared the joint right of custody with Avraham as Orin's married parents. *Id.* The Perez-Vera Report[2] also makes clear that the Hague Convention contemplates joint custody. "[T]he whole tenor of article 3[, which defines wrongful retention,] leaves no room for doubt that the Convention seeks to protect joint custody . . . ." Perez-Vera Report ¶ 84. In other words, a right of custody that is joint and shared with another is a "right of custody" under the Hague Convention. Both parents have a "right of custody" under the Hague Convention.

That right is breached if another person, even if that person is the other joint holder of a right of custody, unilaterally determines the child's place of residence. "[T]he removal [or retention] of a child by one of the joint holders [of custody] without the consent of the other . . . has disregarded the rights of the other parent which are also protected by law . . ." and so is wrongful. Perez-Vera Report ¶ 71. When Hofit wanted Orin to come with her to Israel and Avraham subsequently prevented Orin's departure from Ohio, Avraham unilaterally decided Orin's place of residence. By taking such "unilateral action," Avraham breached Hofit's right of custody.[3] *See id.*

## II.

Although the majority disposes of the case on "right of custody" grounds, the district court focused on the "habitual residence" analysis and denied Hofit's claim on this issue. In my opinion, the district court was right to focus on Orin's habitual residence, but it committed reversible error by failing to compare his relationship to the United States with his relationship to Israel.

---

[2] "Many circuits hold Professor Elisa Perez-Vera's report to be an authoritative source for interpreting the [Hague] Convention's provisions and indeed the Hague Convention itself recognized Perez-Vera's report as official commentary." *Robert v. Tesson*, 507 F.3d 981, 988 n.3 (6th Cir. 2007) (internal citations omitted). "[Professor Perez-Vera's] explanatory report is recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." *Id.* (quoting *Hague International Child Abduction Convention; Text and Legal Analysis*, 51 Fed. Reg. 10494, 10503 (1986)) (internal quotation marks omitted).

[3] On the other hand, if Hofit had taken Orin to Israel with her, against Avraham's wishes, Hofit would have breached Avraham's right of custody under the Hague Convention because they shared the right to determine Orin's place of residence. But such a scenario is not at issue in this case.

The Hague Convention is intended to prevent a child from being "taken out of the family and social environment in which its life has developed." Perez-Vera Report ¶ 12. That results when a court refuses "to restore a child to its own environment after a stay abroad." *Id.* The court in *Robert v. Tesson*, 507 F.3d 981 (6th Cir. 2007), understood these dictates to mean that habitual residence must be determined by comparing the levels of attachment the child has to each of the states in which he or she has resided. 507 F.3d at 996-98. Just as Orin here, the children in *Robert* had lived in two countries, and the court compared the children's relationships with the two places to determine which had a superior claim to being the children's habitual residence. *Cf. Friedrich v. Friedrich*, 983 F.2d 1396, 1402 (6th Cir. 1993) (only analyzing the child's habitual residence with respect to Germany in the "simple case" where the child had resided exclusively in Germany prior to the removal).

The comparative essence of the habitual residence inquiry is captured in the object of the Hague Convention–determining "which country is the proper forum for [the] custody determination," *Koch v. Koch*, 450 F.3d 703, 711 (7th Cir. 2006), not merely whether one forum *suffices* for the custody determination. This takes into account forum shopping, *Robert*, 507 F.3d at 988, which is not at issue in this case,[4] and the *best* place for the child during the pendency of custody proceedings, not simply a place where it is satisfactory for the child to live. *See id.* (looking to "the family and social environment in which [the child's] life has developed," not merely an acceptable locale for the child to reside until custody is decided (quoting Perez-Vera Report ¶ 12)).

To perform this analysis properly, the court in *Robert* proceeded as follows: (1) the court recognized the habitual residence factors as they related to the United States, *id.* at 996-97; (2) the court held that the children's habitual residence was the United States before they entered France, *id.* at 997; (3) the court analyzed the habitual residence factors with respect to France, *id.* at 997-98; and (4) the court decided that it could not conclude that "the [children's] settled purpose [was] to leave the United States

---

[4]Contrary to the majority's assertion, Maj. Op. at 13, forum shopping is not an issue at all in this case. Neither the district court, which denied the return of the child to Israel, nor Avraham argued that Hofit returned to Israel to seek a more favorable custody determination.

behind and make a new habitual residence in the United States," and that  the children's habitual residence was thus the United States, *id.* at 998.  Significantly, the court also made this conclusion even though the children had last lived in France prior to the removal.  *Id.* at 997-98.

In the case at hand, the district court failed to make such a comparison; it gave no consideration at all to the alternative possibility of Israel as Orin's habitual residence despite the myriad of evidence in the record that could have been used to do so.  Orin was born and raised in Israel, having lived there until almost the age of three.  From Israel, which was his only residence until that point, Orin moved to the United States with his parents on April 1, 2007.  He had lived in the United States for only five-and-a-half months when his father and mother separated and his father prevented his mother from taking Orin with her when she returned to Israel.  Throughout his stay, Orin had a close relationship with his extended family in Israel, especially his grandfather, *id.*, and his cousins, *id.* at. 63.  Orin also had a self-evidently close relationship with his mother,[5] who also now resides in Israel.  Yet, contrary to the Hague Convention and our case law interpreting it, the district court explicitly rejected *any* consideration of Israel as Orin's habitual residence, writing:

> Petitioner argues that Orin is acclimated to Israel and not the U.S. because, when in Israel, Orin was part of his mother's large extended family in Tirat Karmel, had many friends in Tirat Karmel, spent most of his time with his mother, and was very close to his teacher.  While this may be true, the Court *must look to whether Orin has become acclimated to the U.S.*

*Id.* at 70 (emphasis added).  Nowhere else in the district court's opinion does it allude to the possibility of Israel as Orin's habitual residence.  *See id.* at 66-72.  The district

---

[5]The closeness of this relationship is evident even only looking at it in retrospect as the court in *Robert* required, and not prospectively as in a custody determination.  The mother resided and now resides in Israel and therefore Orin has a (most) significant relationship with a person in Israel, just as he has a relationship with his cousins in Israel, which all militates in favor of a habitual residence in Israel.  The district court's complete lack of consideration of Orin's relationship with his mother, however, represents significant error in and of itself.  *See, e.g., Pielage v. McConnell*, 516 F.3d 1282, 1289 (11th Cir. 2008) (a young child's "family environment was with his mother").

court thus failed to give any consideration to Israel as Orin's habitual residence that *Robert* requires.

Meanwhile, the comparative factors indicating the United States as Orin's habitual residence are not particularly strong. The child's age and the fact that he had to be taken to such places renders plausible the court's reliance on some of the items that it identified as important, e.g., visiting parks, *id.* at 69, regular trips to the U.S. Air Force Museum, *id.*, the possession of toys, *id.*, and vague notions such as Orin's "socializ[ing] with [] children at Synagogue" and "parties and other social activities," *id.* There is also a telling lack of testimony on these factors from any noninterested parties, such as teachers or administrators from Orin's school in Ohio. Finally, the district court also failed to scrutinize Orin's relationship with his father while they were in the United States. The court in *Robert* took the limited interaction between the children and their father while they resided in America, as well as the fact that the father "did little to welcome them" upon arriving in France, as evidence that the children's habitual residence was the United States and not France. 507 F.3d at 997-98. Similarly here, Avraham was away on business for almost a month-and-a-half of the five-and-a-half months Orin resided in the United States, a point which the district court seemingly ignored. The weakness of the evidence in support the United States as Orin's habitual residence lends credence to Hofit's claim that Israel is Orin's habitual residence. Although some evidence in the record supports, to some degree, the United States as Orin's habitual residence, the evidence must be sufficient to establish a change in habitual residence, since it is uncontested that Israel was Orin's habitual residence before the initial move to Ohio.

Put differently, sufficiency of acclimatization to a new place will vary based on the strength of a child's relationship with his or her prior habitual residence. If Orin had little attachment to Israel, little would be needed to acclimatize him to the United States. But since he spoke Hebrew exclusively for the first three-and-a-half years of his life, had close ties to his mother who resides in Israel, and had close ties to his mother's extended family who all reside in Israel, then much should be required to show acclimatization to

a new place.  Regardless, the district court never decided the critical issue because it committed significant procedural error.  For that reason, I would reverse the judgment of the district court and remand to the district court to consider Orin's relation to Israel in its determination of the child's habitual residence as required by the Hague Convention.