PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MALCOLM WHITE,

*Petitioner-Appellant,*

v.

No. 12-1835

SOUDABEH WHITE,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, Senior District Judge.
(1:12-cv-00378-TSE-JFA)

Argued: March 20, 2013

Decided: May 24, 2013

Before NIEMEYER, MOTZ, and KEENAN, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Niemeyer and Judge Keenan joined.

## COUNSEL

**ARGUED:** Stephen John Cullen, MILES & STOCKBRIDGE, PC, Washington, D.C., for Appellant. Michael Alexander Johnson, ARNOLD & PORTER, LLP, Washington, D.C., for Appellee. **ON BRIEF:** Kelly A. Powers, MILES & STOCKBRIDGE, PC, Washington, D.C., for

Appellant. R. Stanton Jones, ARNOLD & PORTER, LLP, Washington, D.C., for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

In April 2011, Soudabeh White left Switzerland for the United States with her minor son, who had previously resided habitually in Switzerland. The child's father, Malcolm White, initiated this action for wrongful removal under the Hague Convention, seeking the return of his son to Switzerland. The district court found that Ms. White breached no rights of custody in removing the child and therefore denied Mr. White's petition for return. For the reasons set forth within, we affirm the judgment of the district court.

I.

In May 2009, Mr. White married Ms. White in Switzerland. Later that year, they had a son in Switzerland. In June 2010, Mr. White and Ms. White separated and Mr. White initiated legal proceedings in Switzerland pertaining to the separation, including rights to the couple's child. In October 2010, the Swiss Court of First Instance of Geneva authorized Mr. and Ms. White's legal separation and granted "custody of the child" to Ms. White. The court also granted visitation rights to Mr. White "two afternoons each weekend, to be expanded to one weekend in two, in agreement with the curator when the time comes."

Mr. White only learned of the April 24, 2011 departure of Ms. White and the child three days after they had left Switzerland. Ms. White left him a voicemail message saying that she had taken their son on a "holiday" in the United States. Ms. White subsequently claimed that she came to the United

States to visit her sister and seek medical care for her son. Doctors in Switzerland had diagnosed the child with autism; in the United States, doctors later diagnosed him with a feeding disorder for which he has been receiving treatment. Since coming to the United States, the child has been present in the country continuously, except for a brief visit to Canada.[1]

At the time of the departure of Ms. White and the child to the United States, court-appointed psychologists in Switzerland were conducting an analysis of the parties and the child to assess custody arrangements. In July 2011, at which time Ms. White and the child had resided in the United States for three months, the psychologists issued their preliminary report. In it, they suggested that Ms. White suffered from psychological problems, which affected her ability to properly care for her son, and that the court should transfer custody of the child to Mr. White if her condition did not improve within six months.

In September 2011, the Court of First Instance of Geneva issued an emergency ruling prohibiting Ms. White from leaving Switzerland with the child. However, in December 2011, the same court found that it did not have jurisdiction because Switzerland was no longer Ms. White and the child's usual place of residence. In February 2012, the Swiss tutelary court in Geneva also found that it lacked jurisdiction but noted that Ms. White had sole custody of the child and could therefore remove the child from Switzerland without authorization.

On April 6, 2012, upon finding that Ms. White and the child were residing in Alexandria, Virginia, Mr. White brought this action in the United States District Court for the

---

[1]There is a reference in Swiss proceedings to a sighting of Ms. White in Switzerland after April 2011. But, noting the absence of support on Ms. White's passport and her sworn testimony to the contrary, the district court did not credit this reference. We do not find this factual determination to be clearly erroneous.

Eastern District of Virginia. He filed this petition for return under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, and the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.* (2006). The petition alleged one count of wrongful removal. On June 7, 2012, following a bench trial, the district court denied the petition for return. The court found that Mr. White did not establish by a preponderance of the evidence that his son's removal breached any rights of custody. Mr. White noted a timely appeal of that judgment.[2]

The parties filed their appellate briefs in the fall of 2012 and we heard oral argument in the case on March 20, 2013. One day later, Mr. White filed with us an order of the Court of First Instance of Geneva dated March 15, 2013. In that order, the Court of First Instance related that, in September 2012, Geneva's Court of Justice, an appellate court, found the Geneva courts *did* have jurisdiction to rule on protective measures for the child of Mr. and Ms. White. Accordingly, although Ms. White and the child remained in the United States and did not appear at the hearing before the Court of First Instance, in its March 2013 order the Court of First Instance purported to adjust its earlier custody arrangements to "[g]rant[ ] to Malcolm WHITE the custody of and parental authority over the child" and "[g]rant[ ] to Soudabeh WHITE a visitation right of the child."

## II.

This case requires us to decide whether the district court erred in finding that Ms. White's removal of her son from Switzerland to the United States breached no rights of custody under the Hague Convention. In a Convention case, we review factual findings for clear error and legal conclusions

---

[2]Ms. White unsuccessfully sought attorneys' fees in the district court but does not challenge that determination on appeal.

regarding domestic, foreign, and international law de novo. *Maxwell v. Maxwell*, 588 F.3d 245, 250 (4th Cir. 2009). "The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Abbott v. Abbott*, 130 S. Ct. 1983, 1990 (2010) (internal quotation marks omitted).

The Convention states that "[w]here a child has been wrongfully removed or retained . . . the authority concerned shall order the return of the child forthwith."[3] Hague Convention art. 12. "The removal or retention of a child is to be considered wrongful where . . . it is in breach of rights of custody attributed to a person . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal." *Id.* art. 3(a). Because it is undisputed in this case that Switzerland was the child's habitual residence before his removal, Swiss law determines whether there was a breach of rights. *See id.*

The Convention further specifies that "'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.* art. 5(a). It distinguishes "rights of access" from "rights of custody," explaining that "'rights of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence." *Id.* art. 5(b).

Mr. White, as the petitioner, must prove wrongful removal by a preponderance of the evidence. 42 U.S.C.

---

[3]Mr. White's petition alleged wrongful removal, not wrongful retention. Under the Convention, retention may be wrongful only when, unlike in this case, the petitioning parent originally has no objection to the child traveling abroad but the other parent later *retains* the child abroad against the petitioning parent's will. *See, e.g.*, *Karkkainen v. Kovalchuk*, 445 F.3d 280, 290 (3d Cir. 2006) ("Once Karkkainen filed the petition . . . she unequivocally signaled her opposition to [the child]'s presence in the United States. After that date, there was no doubt that [the child] remained with her father against her mother's wishes and was therefore retained.").

§ 11603(e)(1)(A). He offers three reasons why the district court erred in refusing to so find and denying his petition for return. First, he contends that Ms. White's removal of the child breached parental authority rights he retained at the time of removal. Second, he argues that, even if Ms. White had sole custody of the child at the time of removal, under Swiss law, she abused her custody rights. Finally, relying on the new March 2013 Swiss custody determination, Mr. White argues that he now has sole custody over the child and thus the child should be returned to Switzerland. We consider these contentions in turn.

A.

Mr. White first maintains that Ms. White's removal of the child to the United States inhibited parental authority rights he retained under Swiss law and that such rights constitute rights of custody protected under the Convention. Ms. White responds that, even if Mr. White had parental authority rights under Swiss law, her removal of the child did not *breach* any such rights and thus did not violate the Convention.

The October 2010 separation order explicitly awarded "the custody of the child . . . to Soudabeh WHITE." It reserved to Mr. White *only* the "right to visit the child." This language clearly seems to provide that Ms. White had sole custody and Mr. White had only a "right of access," i.e., a "right to take [the] child for a limited period of time to a place other than the child's habitual residence." Hague Convention art. 5(b). Under the Convention, breach of a right of access alone does *not* provide cause for return of a child. *See id.* arts. 3, 12; *Jenkins v. Jenkins*, 569 F.3d 549, 555 n.3 (6th Cir. 2009) ("[T]he remedy of return is available for a wrongful removal or retention but not for a breach of the right to access.").

Mr. White contends, however, that the text of the separation order does not tell the full story because there is a background principle in Swiss law that parents share parental

authority. *See* Code Civil [CC] [Civil Code] Dec. 10, 1907, SR 210, RS 210, art. 297 ("During marriage, the parents shall have joint parental authority."). Such parental authority includes joint responsibility for care, education, religion, and legal representation. *See id.* arts. 296-317. Although Swiss law does specify that, "if the spouses separate, the judge *may* assign parental authority to one of the spouses," *id.* art. 297 (emphasis added), in this case the October 2010 separation order did *not* specifically assign parental authority to either Ms. White or Mr. White.

Thus the order perhaps leaves room for Mr. White's retention of parental authority rights. Courts have previously deemed certain seemingly analogous rights of other countries to be rights of custody under the Convention. *See, e.g.*, *Hanley v. Roy*, 485 F.3d 641, 647-48 (11th Cir. 2007) (finding grandparents' testamentary guardianship under Irish law, involving "joint decision-making authority over the children's education, health, and religious life," sufficient for Convention right of custody); *Whallon v. Lynn*, 230 F.3d 450, 458 (1st Cir. 2000) (same for Mexican patria potestas rights requiring "adequate connection" between parent and child and, by implication, "a meaningful, decisionmaking role in the life and care of the child").

But Swiss parental authority rights alone provide no basis for a wrongful removal action under the Convention. The Swiss Supreme Court has made clear that "subject to an abuse of rights," a parent who holds "exclusive custody is entitled to move with the children, and even abroad, without having to obtain for this the judge's authorization," or the authorization of the other parent. *See* Tribunal fédéral [TF] [Federal Supreme Court] June 1, 2010, 136 ATF III 353 ¶ 3.3. This is true even when the other parent retains parental authority rights. *See id.* ¶¶ 3.4-3.5 ("[G]ranting sole custody to one of the parents [removes] from the other the right to decide on the residence . . . of the children . . . . This means that the legal situation of the holder of the restricted parental authority does

not suffer any prejudice within the meaning of [Hague Convention] art. 3 . . . if the holder of the exclusive right of custody moves the children out of Switzerland . . . ."). In February 2012, the Swiss tutelary court applied the Swiss Supreme Court's teaching in this very case, explaining that, at the time of removal, "Mrs. Soudabeh WHITE [was] the only one who [held] custody of [her son,]" and "the bearer of sole custody may, breach of law excepted, move with the child, notably to a foreign country."

The out-of-circuit cases Mr. White cites in which courts found removal wrongful, ostensibly based on breach of parental authority-type rights, are distinguishable. In none of those cases were the petitioning parent's rights subject to the removing parent's sole right to remove under a governing court order, as interpreted by the courts of the country of habitual residence. *See Hanley*, 485 F.3d 641; *Furnes v. Reeves*, 362 F.3d 702 (11th Cir. 2004); *Whallon*, 230 F.3d 450; *Lieberman v. Tabachnik*, 625 F. Supp. 2d 1109 (D. Colo. 2008); *cf. Bader v. Kramer*, 445 F.3d 346, 350 (4th Cir. 2006) ("*In the absence of any order removing Bader's ability to determine [the child]'s residence*, he continued to retain joint custody . . . ." (emphasis added)); *Shealy v. Shealy*, 295 F.3d 1117, 1123-24 (10th Cir. 2002) (finding removal not wrongful when the father's custody rights were subject to the mother's right to remove under the applicable circumstances of military necessity).[4]

---

[4]Moreover, in most of the cases Mr. White cites, unlike this one, the petitioning parent had a *ne exeat* right to *prohibit* the other parent from removing the child. *See Furnes*, 362 F.3d at 714-16; *Whallon*, 230 F.3d at 458; *Lieberman*, 625 F. Supp. 2d at 1120-23. The Supreme Court has held that, when a parent removes a child without the other parent's consent and there is a *ne exeat* right, there is a breach of custody rights under the Convention -– whatever other custody rights the petitioning parent may also hold. *See Abbott*, 130 S. Ct. at 1990; *see also Furnes*, 362 F.3d at 714 (holding that "[o]ur ultimate decision that Plaintiff Furnes has . . . rights of custody . . . need not, and thus does not, depend wholly on" parental responsibility constituting a right of custody because an applicable "*ne exeat* right . . . constitutes a 'right of custody' as defined in the Convention.").

In short, the district court did not err in holding that Mr. White had not demonstrated that the removal of their child by Ms. White breached any parental authority rights he retained at the time of removal.

B.

Mr. White next maintains that Ms. White's removal "secretly and in the midst of a court-ordered psychological evaluation, was intended to compromise the Father's relationship with the child and threatened the child's well-being," constituting an "abuse of rights under Swiss law." The Swiss Supreme Court has held that "a relocation without reasonable grounds, that is to say only intended to compromise the personal relationships between the child and the other parent," may be an abuse of rights and consequently a breach of rights of custody under the Convention. *See* Tribunal fédéral 136 ATF III 353 ¶ 3.3. Further, "the spouse who holds the right of custody may be barred from taking the child outside the country . . . provided that the wellbeing of the person concerned is seriously threatened by this relocation." *Id.* However, under Swiss law, typical relocation and integration difficulties "do not normally constitute a serious threat" and so "there will rarely be a serious threat to the wellbeing of the child when he is still very young." *Id.*

Whether there was an "abuse of rights" by Ms. White therefore hinges on the factual question of why she decided to leave Switzerland with the child and whether her decision to do so seriously threatened his wellbeing. Ms. White testified at trial in the district court that she brought her son to the United States to see her sister and to seek medical treatment. The district court explicitly found Ms. White's explanation credible. Indeed, the record makes clear that, soon after her arrival in the United States, Ms. White sought medical treatment for the child and received a diagnosis different from the autism diagnosis with which she had been dissatisfied in Switzerland. The child has since continued medical treatment.

Mr. White alleges that the timing of his son's removal to the United States renders this explanation "highly suspect." He points out that the Swiss psychological assessment of the family for custody evaluation purposes was ongoing at the time and that assessment was ultimately unfavorable to Ms. White. The difficulty with Mr. White's reliance on these facts is that the psychologists issued their report three months *after* Ms. White had taken the child to the United States. Mr. White offered no evidence at trial before the district court that Ms. White left the country solely, or even in substantial part, to evade this evaluation and its consequences or that the removal otherwise seriously threatened the child's wellbeing.

Accordingly, we cannot hold that the district court clearly erred in finding that Ms. White had legitimate reasons for coming to the United States. We therefore reject Mr. White's contention that Ms. White's removal of the child from Switzerland constituted an abuse of her rights under Swiss law.

C.

Finally, Mr. White relies on the Swiss Court of First Instance's very recent March 2013 order purporting to transfer custody of the child from Ms. White to Mr. White two years *after* the child's removal to the United States. Mr. White maintains that the new order "dramatically [a]ffects this case" and "confirms that the Swiss Court has always been in accord with [his] position."

But the only reasonable reading of the Convention is that a removal's wrongfulness depends on rights of custody *at the time of removal*. The Convention states that "removal . . . is to be considered wrongful where . . . it is in breach of rights of custody." Hague Convention art. 3(a). Removal could not be considered in breach of rights of custody if those rights did not exist at the time of removal. Moreover, the Convention explicitly provides that removal is only wrongful when "*at the time of removal*" custody "rights were actually exercised . . .

or would have been so exercised but for the removal." *Id.* art. 3(b) (emphasis added).

Thus, courts have repeatedly assumed rights of custody for purposes of Article 3 of the Convention means rights of custody at the time of removal. *See, e.g.*, *Hanley*, 485 F.3d at 645 ("To establish wrongful removal under the Convention, the Hanleys must show that they had 'rights of custody' . . . *when Roy removed the children . . . .*" (emphasis added)); *Bader*, 445 F.3d at 351 ("Bader did retain some existing custodial rights over [the child] *at the time of removal.*" (emphasis added)); *Shealy*, 295 F.3d at 1124 (finding removal not wrongful based on a "interim decision" although "the German courts ha[d] not yet made a final [custody] determination" because the Convention is concerned with "custody rights [that] existed *at the time of removal*" (emphasis added)); *Whallon*, 230 F.3d at 459 ("The pending Massachusetts custody proceedings commenced by Lynn after her removal of [the child] are inapplicable to this action because the Convention refers specifically to . . . rights of custody at 'the time of removal.'").

Because we have not previously addressed directly the question of whether a custody determination after removal affects a Hague Convention case, we look also to the practice of our sister signatories. *See Abbott*, 130 S. Ct. at 1993 ("In interpreting any treaty, the opinions of our sister signatories are entitled to considerable weight. The principle applies with special force here, for Congress has directed that uniform international interpretation of the [Hague] Convention is part of the Convention's framework." (internal citations and quotation marks omitted)). Our sister signatories agree that orders claiming to adjust custody arrangements after removal or retention do not typically affect rights under Article 3 of the Convention. *See, e.g.*, *Thomson v. Thomson*, [1994] 3 S.C.R. 551 (Can.) ("There is nothing in the Convention requiring the recognition of an ex post facto custody order of foreign jurisdictions. And there are several statements in the supplemen-

tary material to support the view that 'wrongful retention' under the Hague Convention does not contemplate a retention becoming wrongful only after the issuance of a 'chasing order.'"); *Re J. (A Minor)*, [1990] 2 A.C. 562 (H.L.) (appeal taken from Eng.) (holding removal not wrongful because of a purported change in custody after the child was removed and no longer habitually resident where the new custody determination was made); *Taylor v. Ford*, (1993) S.L.T. 654 (Scot.) (holding removal not wrongful on the basis of an interim order professing to transfer custody after the child's removal).

The purposes of the Convention further explain why courts consider only rights of custody at the time of removal when assessing wrongful removal claims. "The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." *Abbott*, 130 S. Ct. at 1995. But, under Mr. White's view, a country that has not been the habitual residence of a child for years could at any time modify a previous custody determination, in the absence of the child and the parent who took the child abroad, and thereby potentially justify a return remedy. This would stray far afield from the best interests of the child and the "primary purpose" of the Convention "to preserve the [pre-removal] status quo." *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001) (internal quotation marks omitted); *see also* Elisa Pérez-Vera, Explanatory Report: Hague Conference on Private International Law ¶ 71 (1982) ("[The Convention] is not concerned with establishing the person to whom custody of the child will belong at some point in the future, nor with the situations in which it may prove necessary to modify a decision awarding . . . custody on the basis of facts which have subsequently changed.").

Accordingly, we hold that the determination of whether removal is wrongful is based on rights of custody at the time of removal. The Swiss Court of First Instance's March 2013

order does not purport to reject the authenticity of, or retroactively alter, the previously governing October 2010 order granting Ms. White sole custody of the child. The October 2010 order, which was in effect at the time of the child's removal, therefore controls this case.[5]

### III.

In sum, Ms. White had sole custody of her son when she traveled with him to the United States and Swiss law gave her a unilateral right to remove the child while he was in her sole custody. Mr. White has failed to prove by a preponderance of the evidence that Ms. White's removal of the child abused Ms. White's rights under Swiss law or breached any rights of custody Mr. White held at the time of removal. Accordingly, we affirm the judgment of the district court.

*AFFIRMED*

---

[5]In so holding, we express no view on the merits of the underlying custody determination. *See* 42 U.S.C. § 11601(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims."); Hague Convention art. 19.