McKEAGUE, Circuit Judge.
Colombian father Edison Alberto Carvajal Vasquez ("Carvajal") brought his one-year-old son, TCG, to the United States. The plan was for TCG to stay with his Colombian mother, Paola Andrea Gamba Acevedo ("Gamba"), who was attempting to immigrate to the United States from Colombia. But Gamba was detained by INS in Texas, so Carvajal instead left TCG with Gamba's sister in Tennessee and returned to his home in Colombia. Gamba was subsequently released on bond and joined TCG in Tennessee. About five months later, Carvajal visited Gamba and TCG in the United States, then returned to Colombia, again leaving TCG in the United States. Soon after, Carvajal and Gamba's relationship deteriorated. Almost a year later, Carvajal filed a petition in federal court pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, claiming that TCG had been vacationing in the United States and that Gamba had wrongfully retained him there, beyond the expiration of his tourist visa. The district court denied Carvajal's petition, finding that the United States was TCG's habitual residence and therefore that Gamba's retention of the child in the country was not wrongful. Carvajal appeals, and we AFFIRM.
I.
Carvajal and Gamba are the unmarried parents of minor child TCG. All three are Colombian citizens. TCG was born in Medellín, Colombia, on October 6, 2014. Until the summer of 2016, TCG lived with Gamba in an apartment in Colombia owned by Gamba's parents. Carvajal lived with his own parents, at least during the week, though he claims he lived with Gamba and TCG on the weekends. By the summer of 2016, Carvajal and Gamba had developed a plan for the family to travel to the United States, though the reason for that travel is *523 disputed. Carvajal and TCG were able to obtain tourist visas, but Gamba's multiple visa applications were unsuccessful. Gamba then changed tactics, traveling to Mexico in July 2016 and hiring "coyotes" to smuggle her across the United States border. On August 7, she was discovered and detained by immigration authorities. At trial, Gamba claimed that Carvajal planned and funded the scheme, including wiring money to the coyotes in Mexico. Carvajal dissembled when asked about the wire transfers to Mexico and whether he knew about Gamba's plan to cross the border, but he admitted that he at least had "suspicions" about her intentions. When Gamba was detained, Carvajal wired about $3,000 to Gamba's sister, Kelly Chambers, to hire an immigration attorney for Gamba and to help her post bond.
While Gamba was in immigration custody, on August 26, 2016, Carvajal continued on with the plan and flew with TCG to the home of Gamba's sister and brother-in-law, Kelly and David Chambers, in Tennessee. He then returned to Colombia two days later, leaving TCG in their care. Gamba was released on bond about a month later, on September 30, and flew to Tennessee on October 13. She and TCG would live at the Chambers' home for the next several months.
Carvajal came to Tennessee again on December 19, 2016, and stayed with Gamba and TCG at the Chambers' home for a few weeks. On December 11, shortly before Carvajal arrived, Gamba claims she received a call from a married Colombian woman named Luz Elena stating that Elena and Carvajal were in a relationship-not the first time Gamba had received evidence of such a relationship. In contrast, Elena testified that she has never been in a relationship with Carvajal and claimed that romantic emails between the two were planted by Gamba. When Carvajal arrived in December, he and Gamba reconciled, and Carvajal proposed marriage, which Gamba accepted. Carvajal left Tennessee on January 9, 2017, and, when he arrived in Colombia, he gave away Gamba and TCG's possessions, according to Gamba and her mother. Carvajal claims that TCG's toys are still stored at his house.
After several months in Tennessee, Gamba traveled with TCG to Houston, Texas, for a February 2 immigration hearing. They stayed in Houston for about five months, first because Gamba's court date was rescheduled and then so Gamba could work a new job. TCG's tourist visa expired sometime in February. Also during February, Gamba broke off her engagement with Carvajal, apparently because she was again contacted by Luz Elena. According to the district court, on February 24, 2017, Carvajal filed a criminal complaint in Colombia against Gamba for the crime of arbitrary exercise of custody of an underage child. Gamba and TCG returned to Tennessee at the beginning of July, where they rejoined the Chambers' household. Gamba filed an application for asylum for herself and TCG in the spring of 2018. Her case is set to be heard in January 2021.[1]
Carvajal filed a petition under the Hague Convention in Tennessee on February *524 9, 2018, almost a year after Gamba broke off their engagement, alleging that Gamba had wrongfully retained TCG in the United States. The district court heard five days of testimony from Carvajal, Gamba, and their relatives and acquaintances. Carvajal claimed that TCG's time in the United States had always been intended as a vacation, and that he had planned to take TCG back to Colombia when he visited Tennessee in December 2016, though he admitted that he had purchased a return ticket for himself but not TCG. He then claimed that, because TCG was happy in Tennessee, he let TCG stay there, but expected that Gamba's sister Kelly would bring TCG to Colombia before the expiration of TCG's tourist visa in February 2017. Kelly denied that Carvajal ever asked her to do so. Gamba testified that she had always planned to move to the United States permanently, and that she had expected to apply for asylum along with TCG and Carvajal, though she stated that Carvajal's intentions for himself fluctuated over time.
The district court denied Carvajal's petition, finding that TCG had not been wrongfully retained in the United States in February 2017; rather, the court determined that the United States was TCG's habitual residence on that date because the last shared intent of Carvajal and Gamba was that TCG live in the United States. In the alternative, the court concluded that the United States was TCG's habitual residence because TCG had acclimatized to the country. Carvajal appeals, claiming that the district court erred in relying on the parental-intent standard and erred in its conclusions under both the parental-intent and acclimatization standards.
II.
The purpose of the Hague Convention is to prevent parents from gaining custody of children "by virtue of their wrongful removal or retention." 22 U.S.C. § 9001(a)(2). The goals of the treaty are "to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." Friedrich v. Friedrich ("Friedrich II "), 78 F.3d 1060, 1064 (6th Cir 1996) (citation omitted). Therefore, the only question in this case is "where [the] custody determination should be made." Jenkins v. Jenkins , 569 F.3d 549, 557 (6th Cir. 2009). The underlying custody dispute is "forbidden territory." Friedrich II , 78 F.3d at 1065.
Under Article 3 of the Convention, removal or retention is wrongful if:
(a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention.
Hague Convention, Article 3; Robert v. Tesson , 507 F.3d 981, 988 (6th Cir. 2007). Therefore, to determine whether a child has been wrongfully removed or retained, a district court must ascertain the child's country of "habitual residence" and the date of retention.
The date of retention is easily disposed of in this appeal. The district court determined that the date of retention was February 24, 2017, which is when Carvajal filed a criminal complaint with Colombian authorities. Neither party challenges this date on appeal, so we adopt it as well.
The crux of the case is determining TCG's habitual residence immediately prior to February 24, 2017. We use two standards to determine habitual residence. "The primary approach looks to the place in which the child has become 'acclimatized.' " Taglieri v. Monasky , 907 F.3d 404, 407 (6th Cir. 2018) (en banc). Under the *525 acclimatization standard, "the court must focus on the child, not the parents, and examine past experience, not future intentions." Friedrich v. Friedrich ("Friedrich I "), 983 F.2d 1396, 1401 (6th Cir. 1995). This approach is "generally preferred" because it preserves the child's access to "her family and social environment." Ahmed v. Ahmed , 867 F.3d 682, 688 (6th Cir. 2017). But we have also recently acknowledged the difficulty of applying the acclimatization standard to "especially young children who lack the cognizance to acclimate to any residence." Id. at 689-90 ; see also Taglieri , 907 F.3d at 407-08. In such cases, we look to the parental-intent standard, that is, "the parents' last 'settled mutual intent' for where their child would live." Ahmed , 867 F.3d at 687 (quoting Gitter v. Gitter , 396 F.3d 124, 133, 135 (2d Cir. 2005) ). The petitioner bears the burden to show habitual residence by a preponderance of the evidence under both the parental-intent and acclimatization standards. Id. at 692.
In this case, the district court determined that the parental-intent standard was more appropriate for TCG's case, because TCG was only two years and four months old on the date of the allegedly wrongful retention. The court then concluded that TCG's habitual residence was the United States, based on Carvajal and Gamba's last shared intent. In the alternative, the district court also applied the acclimatization standard and likewise found that TCG's habitual residence was the United States because the child had acclimatized to his residence here. Carvajal challenges the district court's use of the parental-intent standard and the district court's findings under both the parental-intent and acclimatization standards.
III.
The first issue is whether the district court erred in choosing the parental-intent standard over the acclimatization standard.
A. Standard of Review
The standard of review to apply to the district court's choice of habitual-residence standard appears to be unsettled under our precedent. In Ahmed , the first case in which our circuit recognized the parental-intent standard, we held that review of the district court's choice should be de novo. Id. at 686.[2] But Ahmed also held that "the determination of when the acclimatization standard is impracticable must largely be made by the lower courts, which are best positioned to discern the unique facts and circumstances of each case." Id. at 690. And the concurring opinion in Ahmed likewise observed that "[o]pening the door to shared parental intent ... creates more fact-specific questions." Id. at 692 (Gibbons, J., concurring). Despite the tension between Ahmed 's endorsement of de novo review and its suggestion of deference to the lower courts, we need not resolve the issue by confronting the "vexing nature of the distinction between questions of fact and questions of law," Pullman-Standard v. Swint , 456 U.S. 273, 288, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), because we find that the district court's reliance on the parental-intent standard was not erroneous under either de novo review or a more deferential standard.
B. Choosing a Habitual-Residence Standard
Under Ahmed , "it is appropriate to consider the shared parental intent of the *526 parties in cases involving especially young children who lack the cognizance to acclimate to any residence." 867 F.3d at 690. How can a district court tell when a child lacks the necessary cognizance? In some cases, a child is so young or so old that no analysis of the child's cognizance is necessary, by dint of common sense. Ahmed affirmed the district court's conclusion that eight-month-old infants were "unable" to "acquire a degree of settled purpose," without further analysis. 867 F.3d at 690. Likewise, Taglieri observed that "[n]o one thinks that [the child] was in a position to acclimate to any one country during her two months in this world." 907 F.3d at 408. The oldest age at which a court in this circuit has categorically rejected the acclimatization standard appears to be fourteen months. In Flores-Aldape v. Kamash , the district court stated that a child of that age is "too young to form any meaningful connections." 202 F. Supp. 3d 793, 802 (N.D. Ohio 2016) (citation omitted).[3] The court reasoned that, for such a young child, "[h]er experience of the world is limited to the environment created by her parents, and she will likely 'acclimatize' quickly to any residence in which her family and daily routines are present, regardless of geographic location." Id. (citing Holder v. Holder , 392 F.3d 1009, 1020-21 (9th Cir. 2004) ; Delvoye v. Lee , 329 F.3d 330, 333 (3d Cir. 2003) ). On the other side of the equation, though we have not had the opportunity to find that a child was categorically too old to look to parental intent, the Third Circuit has held that a child who is four years old "certainly has [the] ability" to "form meaningful connections with the people and places he encounters each day." Whiting v. Krassner , 391 F.3d 540, 550-51 (3d Cir. 2004).
Between those ages, however, lies the gray area of a child's toddler years, during which time a child at some point develops sufficient cognizance to acclimatize to a country. Faced with such a case, a court must determine whether the evidence shows that a child is cognizant enough to acclimatize, which is most naturally proved by evidence that a child was actually acclimatizing, whether to the child's current residence or to any past residences. Under our precedent, factors that tend to show acclimatization to a country include participation in academic activities, social engagements, and sports programs; appropriate fluency in the local language; and the formation of "meaningful connections with the people and places" of the country. See Robert , 507 F.3d at 996 (citing Karkkainen v. Kovalchuk , 445 F.3d 280 (3d Cir. 2006) ). Therefore, children who are cognizant enough to acclimatize to a country will be able to participate in a variety of acclimatizing activities, to form a sense of routine and environmental normalcy in a country, and to form relationships with people and places in that country. C.f. Whiting , 391 F.3d at 550.
C. Reviewing the District Court's Determination
In this case, although the district court made findings under both the acclimatization and parental-intent standards, it indicated that the parental-intent standard was more appropriate for TCG's case. Carvajal argues that the district court erred in primarily relying on the parental-intent standard. Whether reviewing the district court's choice de novo or with deference, we find that the district court did not err.
In making its decision that the acclimatization standard was "of limited utility" in *527 TCG's case, the district court considered both TCG's age and evidence of TCG's actual acclimatization. TCG was two years and four months old on the date of wrongful retention-older than the children in Ahmed , Taglieri , and Flores-Aldape , but younger than the child in Whiting . The court noted that TCG was "comfortable and settled" in Gamba's sister's home in Tennessee, referred to Gamba's brother-in-law David Chambers (TCG's uncle) as "daddy," saw David's parents as his own grandparents, and was treated as a sibling of his cousins. R. 38, PID 834. At the same time, however, the court found that TCG was "not old enough to participate in academic activities or sports programs, or to engage in social engagements outside his immediate family." Id.
The record supports the district court's determination that the parental-intent standard is more appropriate in TCG's case. Gamba's brother-in-law David testified that TCG would not be old enough to attend the "head start program" in their local Tennessee school district until the fall of 2018, about a year and a half after the date of the allegedly wrongful retention. Gamba's sister Kelly Chambers testified that TCG did not begin to say words until December 2016, just two months before the date of retention. Facts like these show that it was not unreasonable to find that TCG's youth and corresponding cognitive limitations would prevent him from systematically forming " 'meaningful connections with the people and places' in a country." Ahmed , 867 F.3d at 689 (quoting Robert , 507 F.3d at 996 ).
Carvajal argues that TCG's attendance at school and swimming lessons in Colombia prove that "academic activities" and "sports programs" were not beyond TCG's capabilities. These activities may indeed be relevant to whether TCG was cognizant enough to acclimatize, at least because they show that TCG was old enough to attend certain activities during which he might form meaningful connections, but attendance alone is weak evidence of such a young child's ability to acclimatize. Academic activities are "central" to a child's life, even at a preschool level, not just because they consistently occur in the same place but because they provide an environment for the child to learn language and other skills and to make friends. C.f. Jenkins , 569 F.3d at 552 (observing that a three-year-old child was learning Hebrew and English and attending the birthday parties of his friends from preschool and synagogue). TCG was one year and ten months old when he left Colombia in August 2016. At some point before that date, he was enrolled in something Carvajal characterized as both "school" and "day care" and Gamba characterized as "day care." For such a young child, evidence of learning, friendships, or attachment to the institution would bolster Carvajal's claim that TCG was actively participating in the sort of "central" academic activity we have described, but Carvajal cannot point to any such evidence. Likewise, sports can provide a structured environment where a child can learn skills and make friends in a country, and thereby "acquire a degree of settled purpose" in that country. Ahmed , 867 F.3d at 687 (quotation omitted). Carvajal's argument that TCG's swimming lessons in Colombia provide some evidence of TCG's ability to acclimatize is again colorable, but there is no testimony about TCG's development of skills, routine, and relationships during those lessons. In sum, while TCG's attendance in school or day care and in infant swim classes may be relevant to TCG's ability to acclimatize, such attendance alone, without evidence that TCG was actively acclimatizing, does not persuade us that the district court was incorrect. Thus, under either de novo review or a more *528 deferential standard, we find that the district court correctly determined that the parental-intent standard was more appropriate for TCG's case.
IV.
After deciding that the parental-intent standard was the more appropriate choice in TCG's case, the district court found that the last shared intent of Carvajal and Gamba was that TCG live in the United States. Carvajal also challenges this finding on appeal.
A. Standard of Review
The standard of review for the district court's determination of habitual residence under either the parental-intent standard or the acclimatization standard is unambiguous: the court's findings are reviewed for clear error. Taglieri , 907 F.3d at 405 ; Ahmed , 867 F.3d at 686 ; Robert , 507 F.3d at 995. Clear error review is "highly deferential," and the district court must be affirmed "unless the fact findings 'strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.' " Taglieri , 907 F.3d at 408-09 (quoting United States v. Perry , 908 F.2d 56, 58 (6th Cir. 1990) ). In reviewing the district court's conclusion, "[w]e must trust those with a ring-side seat at the trial to decide whose testimony is most credible and what evidence is most relevant." Id. at 411. Credibility determinations are especially important in this case, where the bulk of the evidence takes the form of testimony by Carvajal, Gamba, and their relatives and acquaintances. The district court's opinion notes that weighing that evidence was "exceptionally difficult" because of "basic inconsistencies" in the testimony and because all but one witness testified by translator, and many by telephone. R. 38, PID 822. On the whole, the district court found Gamba's story to be "inherently more consistent and plausible," and her and her witnesses to be "more credible." Id. , PID 822-23.
B. Relevant Precedent
The parental-intent standard was first recognized by the Sixth Circuit in Ahmed in 2017. In defining the standard, Ahmed was able to draw upon cases from our sister circuits, which have a longer history of applying this standard. See Ahmed , 867 F.3d at 689-90 (collecting cases). Under the parental-intent standard, when the child is not cognizant enough to acclimatize in a particular country, the district court looks to "the parents' last 'settled mutual intent' for where their child would live." Id. at 687 (quoting Gitter , 396 F.3d at 133, 135 ). As the Ninth Circuit pointed out in Mozes v. Mozes, 239 F.3d 1067 (9th Cir.2001), "[d]ifficulty arises, of course, when the persons entitled to fix the child's residence no longer agree on where it has been fixed." 239 F.3d at 1077. In such a case, if "the representations of the parties cannot be accepted at face value, ... courts must determine [habitual residence] from all available evidence." Maxwell v. Maxwell , 588 F.3d 245, 252 (4th Cir. 2009) (quoting Gitter , 396 F.3d at 135 ). In other words, the court must look to "external indicia" of the parents' intent. Taglieri , 907 F.3d at 417 (Moore, J., dissenting). For example, in Barzilay v. Barzilay , the Eighth Circuit observed that the parents were in the United States using temporary work visas, which weighed against an intention to stay. 600 F.3d 912, 918 (8th Cir. 2010). On the other hand, the fact that the parents did not maintain a home in Israel or disclose any plans to return to Israel supported the proposition that they had abandoned their residence in that country. Id.
C. Application
Under the parental-intent standard, Carvajal bore the burden of proving, *529 by a preponderance of the evidence, that Carvajal and Gamba's last shared intent was that TCG live in Colombia. The district court concluded that the parents' last shared intent was that TCG live with Gamba in the United States: "Although it is unclear whether Carvajal ever really intended to move permanently to the United States, the court finds that he knew that Gamba intended to do so and that she intended to have her son with her." R. 38, PID 823. The court based its conclusion on its factual findings that Carvajal voluntarily brought TCG to the United States to stay in the country with Gamba, that Gamba had always intended for TCG to live with her in the United States, and that Carvajal agreed with Gamba's intentions until Gamba broke off their relationship in February 2017. Although Carvajal testified that he had always intended to bring TCG back to Colombia, the court found no evidence of any such plan.
The district court's conclusions are not clearly erroneous. Gamba testified that she planned to stay in the United States permanently. Gamba's desire to move to the United States, whether legally or illegally, is evidenced by her multiple unsuccessful visa applications and ultimate plan to cross the border covertly. Importantly, Carvajal knew about that desire when he brought TCG to the United Sates and left him in Tennessee. Carvajal almost certainly financed Gamba's trip by paying "coyotes" to smuggle her across the Mexican border. Carvajal's aunt, Diana Vasquez, testified that Gamba had long been "bedazzled" by the idea of living in the United States, so Gamba's desire was clear to those around her. Even after Carvajal proposed marriage in December, he testified that Gamba told him she still wanted to remain in the country. Finally, when Carvajal testified that he thought TCG would be returning to Colombia in February 2017, he claimed that it was Gamba's sister Kelly, and not Gamba herself, who would accompany TCG. Yet despite knowing Gamba intended to remain in the United States with TCG, Carvajal twice left TCG in the United States-first in August 2016 with Gamba's sister, then in January 2017 with Gamba.
As for Carvajal's alleged plans to bring TCG back to Colombia in January or for Kelly to bring TCG back in February before the expiration of his visa, the district court concluded that there was no evidence to support the existence of either plan. It is true that TCG's visa expired in 2017, which provides some support for Carvajal's testimony. But as the district court noted, TCG had never lived with Carvajal, even during the weeks Gamba was traveling to the United States, and Carvajal offered no evidence to show he was preparing to be TCG's caretaker-for the first time ever-in Colombia. Furthermore, when Carvajal traveled to the United States in December 2016, he bought a return ticket for himself but no ticket for TCG. Finally, Kelly flatly denied ever agreeing to fly TCG back to Colombia.[4]
Viewing the record as a whole, as we must, it is clear from Carvajal's actions that he acquiesced in Gamba's plans for TCG to grow up in the United States. In sum, we do not find clear error in the district court's determination that Carvajal *530 and Gamba's last shared intent was that TCG live in the United States with Gamba. Carvajal's petition was therefore properly denied.
V.
Although the district court concluded that the parental-intent standard was the more appropriate approach given TCG's youth and ability to acclimatize, the court also applied the acclimatization standard in the alternative and found that TCG had acclimatized to the United States, such that the United States was his habitual residence on the date of the allegedly wrongful retention. Carvajal, who argues that the acclimatization standard was indeed the appropriate standard in TCG's case, claims that the district court erred in its findings under this standard. Because we agree that the parental-intent standard was the more appropriate standard for TCG's case, and because the district court's findings under that standard were not clearly erroneous, we need not address the district court's alternative findings under the acclimatization standard.
VI.
The district court's denial of Carvajal's petition is AFFIRMED.

This information is derived from documents that Gamba filed with the court as part of a motion to take judicial notice. We may take notice of documents offered to show the existence of judicial proceedings and not to prove the truth of any matters asserted in those proceedings. Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc. , 969 F.2d 1384, 1388 (2d Cir. 1992) (citation omitted). And we do so here in order to complete the record. Gamba's accompanying motion to file these documents under seal to protect TCG's identity is likewise appropriate. See Fed. R. Civ. Pro. 5.2(a), (d). Gamba's motions to take judicial notice and file under seal are therefore granted.

Ahmed cited Robert , 507 F.3d at 987, for this proposition, but Robert does not indicate why de novo review is appropriate, and, in any case, Robert may no longer be good law now that district courts have a choice between the acclimatization and parental-intent standards in cases involving especially young children.

Flores-Aldape predated Ahmed by a year and anticipated Ahmed 's sanctioning of the parental-intent standard for especially young children.

Carvajal also argues on appeal that the plan for TCG to live in the United States was conditioned on Carvajal, Gamba, and TCG applying for asylum in the United States as an intact family and that the breakdown of Carvajal and Gamba's relationship voided any shared intent the couple once maintained. We need not decide whether conditional intent has any place in the habitual-residence inquiry because, as the district court concluded, the record shows that Carvajal's intent was that TCG live with Gamba in the United States "regardless of whether [Carvajal] himself intended to stay." R. 38, PID 825.