NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0331n.06

No. 23-1107

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 20, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| WILLIANE RODRIGUES DOS SANTOS ARGUETA, | ) ) | |
|     Petitioner-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) ) | |
| OMAR ARGUETA-UGALDE, | ) ) | |
|     Respondent-Appellant. | ) ) ) | OPINION |

Before: COLE, CLAY, and KETHLEDGE, Circuit Judges.

**CLAY, Circuit Judge.** Respondent-Appellant, Omar Argueta-Ugalde ("Omar"), appeals the district court's grant of Petitioner-Appellee Williane Rodrigues Dos Santos Argueta's ("Williane") petition for the return her minor child, M.A., pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Child Abduction Convention" or the "Convention") and its implementing statute, the International Child Abduction Remedies Act, 22 U.S.C.A. §§ 9001, *et seq*. For the reasons set forth below, we **AFFIRM** the district court's order granting Williane's request for the return of her child.

## I. BACKGROUND

### A. Factual History

Williane is a citizen of Brazil, and Omar is a citizen of Mexico. Omar has been employed by a U.S. based company for the past ten years and is often stationed in different parts of the world. Omar met Williane while on a work assignment in Brazil in 2015. The couple was married in

2017 and had a baby girl together, M.A., in August 2018. In 2019, Williane and Omar jointly purchased a home in Brazil that they lived in together with M.A. and Williane's two other children from a prior marriage.

In June 2019, Omar was assigned to work in China. Once he received this work assignment, the couple began moving back and forth between Brazil and China for reasons that they dispute. Williane alleges that the moves were motivated by marital issues, while Omar alleges that they were motivated by the pandemic and travel restrictions. The following is a chronology of the couple's travels starting in June 2019.

- **June 2019 – January 31, 2020 (China):** Omar, Williane, M.A., and Williane's two older children moved to China. Before leaving Brazil, the couple decided to rent out the house that they had purchased earlier that year.

- **January 31, 2020 – September 20, 2020 (Brazil)**: Williane and all three children left China and went back to Brazil. Omar remained in China. During this first trip back to Brazil, Williane started a pharmacy business, which Omar funded.[1]

- **September 20, 2020 – June 20, 2021 (China)**: Williane and the children returned to China to be with Omar.

- **June 20, 2021 – November 28, 2021 (Brazil)**: Williane and the children left China and stayed in Brazil. The house they had purchased in 2019 was occupied by tenants so they could not live in it. Williane found it difficult to find rental housing so the couple decided to purchase another property for the family to live in.

- **November 28, 2021 – July 31, 2022 (Mexico)**: Williane and the children left Brazil to meet Omar in Mexico. Williane began to do some traveling on her own. Williane claims she began travelling for work purposes, to manage her businesses in Brazil. Omar claims she travelled for an extramarital affair. When she travelled, she left all three children with Omar in Mexico.

---

[1] During subsequent trips to Brazil, Williane also opened a construction business with marital funds. Omar also notes that the couple had previously jointly run a "person-to-person real estate business" but that Williane "was the only person with access to those funds and records." Appellant's Br. at 8.

- o **January 24, 2022 – May 2022**: Williane traveled to Brazil.
- o **June 8, 2022 – July 2, 2022**: Williane traveled to Argentina for about a month.
- **July 31, 2022 – November 6, 2022 (United States)**: Williane, Omar, M.A. and the other two children all resided in Michigan.
    - o **August 24, 2022 – September 16, 2022**: Williane visited Brazil.

Omar and Williane's marital issues exacerbated after the move to Michigan. Williane alleges that, when she returned to Michigan in September, Omar became emotionally abusive. She alleges he cancelled her cell phone line and credit cards and excluded her from events to which he took M.A. to in order to hide the fact that M.A. had a mother. Omar disputes this characterization of events and alleges that Williane was an absent mother who was preoccupied with a prolonged affair that he only discovered when they moved to Michigan. Williane called the cops when Omar took M.A. to a birthday party, allegedly because he took M.A. without telling her where he was going.

On October 31, 2022, Omar filed for divorce in Michigan state court. Williane wanted to leave Michigan and go back to Brazil with all of the children, but she alleges that they did not go because the children's passports and vaccination cards went missing, either because Omar lost them or hid them from her. Williane left the United States on November 6, 2022, to return to Brazil without any of the children. On November 17, 2022, Williane sent Omar a text message requesting that he send all three children back to her in Brazil by November 20, 2022. Omar never responded to that message. He did not send the children back by the date requested.

### B. Procedural History

Upon her return to Brazil, Williane retained an attorney, initiated divorce proceedings in Brazilian court, and requested that the Brazilian court give her full custody of M.A. On November 18, 2022, the day after requesting Omar send the children back to Brazil, Williane filed a police report in Brazil requesting assistance with the return of her minor children pursuant to the Hague Convention. After Omar did not return the children per her request, on November 22, 2022, Williane filed a petition in the United States District Court for the Eastern District of Michigan for the return of M.A. and her other two children pursuant to the Hague Child Abduction Convention. Omar was served with the petition on December 1, 2022.

Ultimately, Omar agreed to return the older two children and arrangements were made for their return. Beginning on January 4, 2023, the district court held a three-day virtual evidentiary hearing on the petition. On February 2, 2023, the district court issued an opinion and order granting the petition for M.A.'s return. In the opinion, the district court noted that, although it found both parties had credibility issues, Williane's testimony was slightly more credible.

Omar timely appealed. Omar also filed a motion to stay the district court's order pending appeal. On February 21, 2023, the district court denied the motion and ordered Omar to return M.A. to Brazil within 30 days. Omar then filed a motion with this Court to stay the district court's order pending appeal. On March 15, 2023, this Court denied the motion to stay, determining that Omar had not established a strong likelihood of success on the merits and that the public interest weighs against a stay. M.A. was then returned to Brazil.

## II. DISCUSSION

### A. Standard of Review

This Court reviews *de novo* the district court's application and interpretation of the Hague Child Abduction Convention as well as its conclusions about "American, foreign, and international law." *Salame v. Tescari*, 29 F.4th 763, 767 (6th Cir. 2022) (citing *Simcox v. Simcox*, 511 F.3d 594, 601 (6th Cir. 2007)). The Court reviews the district court's factual findings for clear error. *Id.* "Clear error will be found only when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Max Trucking, LLC v. Liberty Mut. Ins. Corp.*, 802 F.3d 793, 808 (6th Cir. 2015). When reviewing a district court's factual findings, "this Court gives due regard to the district court's opportunity to judge the credibility of the witnesses." *Holt v. City of Battle Creek*, 925 F.3d 905, 910 (6th Cir. 2019) (quoting *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 597 (6th Cir. 2001)).

### B. Analysis

Omar argues that the district court erred in granting Williane's petition for the return of M.A. to Brazil. He argues that the district court erred by determining: (1) that M.A.'s place of habitual residence was Brazil; (2) that Omar had not proven that Williane consented to M.A.'s relocation to Michigan by a preponderance of the evidence; and (3) that Omar's retention of M.A. in the United States following Williane's departure was not wrongful because Omar has equal custody rights and no custody order prevented him from keeping M.A. in the United States.

Brazil and the United States are both signatories to the Hague Child Abduction Convention.[2] The Hague Child Abduction Convention requires the return of any child wrongfully removed from her country of habitual residence. *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020). Courts deciding Hague Child Abduction Convention cases have "jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute." *Douglas v. Douglas*, No. 21-1335, 2021 WL 4286555, at *4 (6th Cir. Sept. 21, 2021).

The most important determination that a court makes when resolving a petition brought pursuant to the Hague Child Abduction Convention is that related to a child's place of habitual residence. This is because the retention of a child is considered "wrongful" only when it is "done in violation of the custody laws of the child's habitual residence." *Monasky*, 140 S. Ct. at 723. The Convention's "core premise" is that a child's best interests are served when their country of habitual residence is the one to make custody decisions. *See id.* The Convention recognizes a few exceptions to the requirement that an unlawfully retained child be returned, including for when a parent has consented or acquiesced to the child's retention. *See Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996) (discussing defenses that may be invoked by a respondent).

Accordingly, the Court will first address (A) M.A.'s place of habitual residence; then (B) whether Omar wrongfully retained her; and, if the retention was wrongful, then (C) whether the consent or acquiescence defense applies.

---

[2] *See Brazil*, U.S. Dep't of State Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/International-Parental-Child-Abduction-Country-Information/Brazil.html

### 1. M.A.'s Place of Habitual Residence

Until the Supreme Court's decision in *Monasky*, 140 S. Ct. 719, this Circuit had applied a test that determined a young child's place of habitual residence by assessing whether the parents had made an agreement about where to raise the child. *See Taglieri v. Monasky,* 907 F.3d 404, 408 (6th Cir. 2018) (citing *Ahmed v. Ahmed,* 867 F.3d 682, 689 (6th Cir. 2017)). In *Monasky*, however, the Supreme Court held that "the determination of habitual residence does not turn on the existence of an actual agreement." 140 S. Ct. at 726. Instead, habitual residence "is a fact-driven inquiry," and particularly where young children and infants are involved, "the intentions and circumstances of caregiving parents are relevant considerations." *Id*. at 727. The Supreme Court stressed, however, that "[n]o single fact [] is dispositive across all cases" since "agreement can hardly be expected" when the "parents' relations are acrimonious." *Id*. at 728. *Monasky* also clarified that after determining de novo that a district court has properly identified the "governing totality-of-the-circumstances standard," the district court's determination regarding a child's habitual residence is subject to clear error review as a question of fact. *Id*. at 730.

In this case, the district court correctly determined that the proper standard for assessing habitual residence is based on the totality of the circumstances. The district court then weighed the testimony of the parties and noted that, although "it cannot find either party fully credible or persuasive" given the fact that each party had substantial motives to recall events in their favor, Williane's "testimony [tends] to be more credible." Op. and Order, R. 22, Page ID #470–71. In determining habitual residence, the district court examined both M.A.'s acclimation to the United States and the parents' last shared intent.

The district court first determined that, until departing Mexico for the United States on July 31, 2022, M.A.'s place of habitual residence was Brazil. The district court made this finding because (1) up until that point, M.A. had spent half of her life in Brazil, (2) she was in constant communication with her Brazilian extended family throughout her travels to different countries, and (3) despite traveling to China twice, M.A. went back to Brazil twice to reside, indicating that Brazil was her home base. The district court determined that the only constant in M.A.'s life was Brazil and that Mexico was not a habitual residence because the family's stay there was transitory and the parties did not testify that they intended their stay in Mexico to be permanent. The district court also looked at parental intent as a factor and noted that Williane and Omar's actions evidenced an intent to keep Brazil as the location for the family home, citing the purchase of two properties as well as Williane's attempts to establish businesses in Brazil that were funded by Omar, even when they moved abroad.

The district court then determined that the four months[3] that M.A. spent in the United States were not sufficient to "overcome the overwhelming evidence suggesting that Brazil remained M.A.'s habitual residence." Op. and Order, R. 22, Page ID #476. The district court noted that, although there was some evidence that M.A. had developed meaningful connections with her classmates, there was no evidence these connections were more meaningful than those she had developed in either Mexico or China, and M.A. had spent less time in the United States than she had in either of those two countries. The district court found it relevant that M.A. continued to

---

[3] The district court used December 1, 2022 as the date of wrongful retention because that was the date that Omar was served with the Hague Child Abduction petition. Neither party contests that this was the appropriate date to use for wrongful retention, so we will adopt it. *See Carvajal Vasquez v. Gamba Acevedo*, 931 F.3d 519, 524 (6th Cir. 2019) (adopting date of retention used by the district court since neither party challenged the date on appeal).

video call her family in Brazil on a weekly basis and looked to Williane and Omar's last shared intent and determined that they last agreed that M.A. would go back to Brazil in January of 2023. The district court's determination was based in part on the fact that Williane maintained her businesses during her time in the United States and in part on the "parties' past and consistent behavior of travelling with all three children." *Id*. at Page ID #477, 479. The district court credited testimony by Williane's ex-husband, who is the father of Williane's two older children, that it was his understanding the parties would be returning to Brazil in January of 2023.

Omar argues that the district court's credibility determinations for deciding habitual residence were clearly erroneous. He argues that the district court committed clear error because it: (1) relied on an unqualified translator for the proceeding; (2) relied on Williane's testimony which was "internally inconsistent . . . and demonstrably false[;]" and (3) ignored undisputed evidence demonstrating that M.A. had acclimated to Michigan. Appellant's Br. at 33–34.

### a. Issues with Interpreter

With respect to the first point, Omar argues that, at several points in the proceeding, the translator was on the phone with Williane communicating to her what was happening in the proceeding and that this prevented the other parties from hearing what the translator was saying to Williane. Omar adds that Williane's counsel had to correct or clarify the translation provided by the translator seven different times, all of which occurred during Williane's cross-examination. He argues that this shows that the translator was incompetent and that the district court was willing to overlook the translator's lack of qualifications.

In the context of immigration proceedings, this Court has found that the due process rights of a litigant can be implicated if the district judge's credibility determinations are based on a faulty

translation or interpretation. *See Amadou v. I.N.S.*, 226 F.3d 724, 728 (6th Cir. 2000) (determining petitioner was prejudiced by immigration judge's adverse credibility determination where the immigration judge relied on an interpreter who lacked the ability to understand the petitioner and record revealed that interpreter was not familiar with vocabulary and terminology essential to petitioner's claim). The fact that an interpreter makes some errors in the course of interpreting is not, by itself, enough to demonstrate that the judge's credibility determinations were erroneous. The record must reveal that the translation errors formed the basis for the judge's decision and prejudiced the complaining litigant. *See Gishta v. Gonzales*, 404 F.3d 972, 979 (6th Cir. 2005); *Gishta v. Ashcroft*, 121 F. App'x 585, 592 (6th Cir. 2005). This requires a showing that the judge was aware of difficulties in the translation process, that the person testifying and the interpreter had trouble understanding each other, and that the interpretation errors were egregious and material to the district judge's findings. *See id.*

When examining whether a litigant was prejudiced by a faulty interpretation, this Court has examined whether the interpreted answers were responsive to the questions asked, whether there were grammatical errors or general confusion during the proceedings, whether the interpreter indicated she could not understand the person testifying or whether the person testifying indicated he could not understand the interpreter, and whether a litigant's attorney understood the language being interpreted and could thus object to a material mistranslation. *See Alhousseini v. Sessions*, 751 F. App'x 674, 678 (6th Cir. 2018) (finding no due process violation on the basis of faulty interpretation where the record did not reveal any instances of confusion or unresponsive answers and where petitioner's responses were read back to him); *Koods v. Gonzales*, 129 F. App'x 263,

265 (6th Cir. 2005) (finding no due process violation based on faulty interpreter where petitioner's attorney spoke both languages that petitioner used during testimony).

Here, Omar's counsel initially questioned the qualifications of the interpreter but was satisfied after the interpreter indicated that she had interpreted several times in federal court.[4] Omar also references seven occasions where the interpreter made errors during Williane's testimony on cross-examination. In each of those seven instances, however, Williane's attorney, Mr. Alvarez, who understands both Spanish and Portuguese, objected and either corrected the testimony or asked the interpreter to clarify the translation. Omar also takes issue with the fact that Williane's attorney only corrected the record during Williane's cross-examination, and points to this as a reason to doubt the interpreter's credentials. Omar, however, points to no instances outside of cross-examination where there were errors, general confusion, or mistranslations in the record.

The only identified translation errors were minor and were immediately corrected by Williane's counsel. Additionally, the record also reveals that Omar understands and speaks Portuguese and had the opportunity to alert his counsel to any misrepresentations in the interpretation process. *See Koods*, 129 F. App'x at 265 (noting that petitioner's attorney could speak both languages that petitioner testified in and thus it was "highly unlikely that Koods's attorney would have sat through the hearing and not objected to material mistranslations" but

---

[4] After the interpreter noted that she had interpreted for the federal district court in Detroit several times, the district court asked Omar's counsel: "Mr. Bossary, with your hand gesture, I'm assuming that you're satisfied," and Omar's counsel responded, "Yes, Your Honor." Hr'g Tr., R. 31, Page ID #546. At one point during the proceeding, the interpreter's husband, who was also serving as a backup interpreter, was required to step in as interpreter. Omar's counsel stated he had no objection to the backup interpreter, noting that "my client can hear it and let him know if there's any concern." Hr'g Tr., R. 31, Page ID #739.

would have interjected to clarify another minor mistranslation). Omar has identified no other instances of misinterpretation or confusion during the three-day hearing. Accordingly, the district court made no clear errors in relying on the translations provided.

### b. Credibility of Williane's Testimony

Omar also argues that the district court's credibility determinations should be called into question because Williane's testimony was, at times, "internally inconsistent" and "demonstrably false." Appellant's Br. at 27. He argues that Williane's testimony was inconsistent or questionable because: (1) she did not list any of her business assets on her Brazilian divorce filing; (2) she testified she was unable to locate the children's passports but later admitted she knew where the passports were; (3) she testified that she returned to Brazil to oversee her businesses, but the real reason for her travel there was to continue her extramarital affair; (4) she stated that M.A. called Omar by his first name when M.A. was 1.5 years old; (5) she claimed that Omar did not want a divorce but later alleged that Omar agreed to divorce when M.A. was older; (6) she was upset by Omar's divorce filing and instituted this action in retaliation for Omar's divorce filing; (7) she alleged Omar disconnected her phone but later acknowledged the disconnection was not Omar's fault; and (8) she attempted to present to the district court an incomplete text chain of a conversation between herself and Omar.

Omar argues that these inconsistencies should cast doubt on Williane's credibility as a witness. The district court, however, did not find Williane's testimony entirely credible, it merely found her testimony more credible than Omar's as it related to the issues of acclimation and last shared intent. Additionally, all of the alleged inconsistencies raised by Omar relate to collateral matters, and not to the district court's determination as to habitual residence. *See United States v.*

12

*England*, No. 21-5273, 2023 WL 1777533, at *12 (6th Cir. Feb. 6, 2023) (finding that defendant offered no persuasive reason for setting aside district court's factual findings and credibility determinations where witness' alleged inconsistencies were minor and did not render his testimony inaccurate or untrustworthy).

Moreover, Williane provides a plausible explanation for each alleged inconsistency, revealing that there are two permissible ways of viewing the evidence.[5] This Court is required to give a district court's factual findings great deference when those findings are based on a credibility determination. *United States v. Hinojosa*, 606 F.3d 875, 882 (6th Cir. 2010). Where there are two permissible ways of viewing evidence, the district court does not commit clear error in choosing one view over another. *Id.* (citing *United States v. Navarro–Camacho*, 186 F.3d 701, 708 (6th Cir.1999)). Accordingly, the district court's decision to credit Williane's testimony was not clearly erroneous. *Id.*

---

[5] With respect to each point that Omar raises above, Williane argues that: (1) her failure to list marital funds on her Brazilian divorce filing is not an inconsistency, because she does not believe Brazilian law requires such a disclosure or that the businesses are subject to division as marital assets under Brazilian law; (2) regarding the location of the passports, she made no such admission and that the appearance of an inconsistency is due to Omar's attorney asking a single question with multiple parts and never clarifying whether her answer was to the first part of the question (about her intent to take all the children with her back to Brazil in November of 2022) or to the second part of the question (about whether she was able to locate their passports); (3) her intent in returning to Brazil cannot be gleaned by the single photograph that Omar produced showing that Williane had an affair, and argues that this photograph says nothing about her intent in returning to Brazil or her ability to operate her business; (4) Omar makes no argument and provides no reason to believe this is an inconsistent or false statement; (5) her testimony is not inconsistent but shows that both of their feelings about their marriage changed over time; (6) Omar's statement is false and she never admitted she filed the Child Abduction petition in retaliation to Omar's Michigan divorce filing; (7) there is no inconsistency regarding her testimony about the cell-phone being cut off, Williane was merely recounting Omar's explanation for her phone not working, not admitting that the problem was with her phone; and (8) both parties stipulated to the admission of the text message chain and any objections to it were resolved at the hearing.

### c. District Court's Habitual Residence Determination

Omar argues that the undisputed evidence shows that M.A. acclimated to life in Michigan. Omar argues that his testimony and the testimony of the mother of M.A.'s preschool friend reveals that M.A. had become settled and enmeshed in the community in Michigan and that it is extremely unlikely that M.A. herself has any connections in Brazil comparable to those she has formed in the United States. Omar, however, merely asks this Court to weigh this evidence—which the district court considered—and assign it greater weight than the district court did.

An appeals court is not permitted to weigh the evidence differently from the district court, unless the district court relied on false or clearly incredible evidence. *Osborn v. Griffin*, 865 F.3d 417, 437 (6th Cir. 2017) (stating that when reviewing for clear error if "the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently"). As noted above, clear error review is highly deferential and when reviewing such cases, we typically affirm a district court's factual findings unless they strike the Court "as wrong with the force of a five-week-old, unrefrigerated dead fish." *Carvajal Vasquez v. Gamba Acevedo*, 931 F.3d 519, 528 (6th Cir. 2019) (quoting *Taglieri*, 907 F.3d at 408–09).

Omar argues that the district court erred by considering Williane's business ventures in the context of determining whether M.A. was acclimated in the United States. The district court, however, did not consider Williane's business in the context of considering whether M.A. had acclimated to life in Michigan. Instead, the district court considered Williane's on-going business ventures, which Omar concedes he funded, in its determination that the parties' last shared intent was to have M.A. reside in Brazil beginning in January 2023. Although last shared intent is not

by itself dispositive of a child's habitual residence, courts are still permitted to consider last shared intent as a factor in deciding habitual residence. *Monasky*, 140 S. Ct. at 727. In this case, the district court did not treat last shared intent as dispositive, and it merely considered it as a factor in addition to acclimation.

Omar also argues that the district court erred by determining that the last shared intent of the parties was for M.A. to reside in Brazil beginning in January 2023. He argues that the evidence he presented—including that his job has a permanent assignment in Michigan, his U.S. bank account, his Michigan Driver's license, and his plan to apply for United States residency—all undisputedly shows that the parties' last shared intent was to reside in the United States for at least one year. The district court, however, found it more compelling that only four months had passed, that Williane continued to travel to Brazil to maintain her businesses, and that Williane and Omar had previously travelled with all three children and likely intended to keep all three children together.

The district court also decided to credit testimony from Williane's ex-husband that M.A.'s siblings would be returning to Brazil in January 2023. The district court's decision to credit this testimony was not clearly erroneous as it was supported by the parties' prior conduct in moving all three siblings together. *See* Appellant's Br. at 7–12 (noting that the children moved together with Williane as she went back and forth from China to Brazil, and that the children stayed together with Omar in Mexico while Williane travelled back to Brazil); *see, e.g.*, *Knox Cnty., Tennessee v. M.Q.*, 62 F.4th 978, 996 (6th Cir. 2023) ("Finders of fact have wide latitude in making credibility determinations. It was well within the district court's discretion to give weight to certain experts' opinions and not to rely on the opinions of others.").

15

The district court did not clearly err by weighing the competing evidence and finding that M.A.'s connections to Brazil were stronger than the connections she had formed during her four months in the United States. The district court properly noted that, although M.A. had established some friendships in the United States, the majority of M.A.'s family and relationships remained in Brazil and she had continued to be connected to those relationships through video calls. Moreover, the district court did not clearly err when it found that the family intended to maintain Brazil as a home base for the children, as evidenced by Williane's ongoing business ventures (for which Omar provided capital), the two properties that the couple acquired but never sold, and the fact that the father of Williane's other two children expected their return to Brazil in January 2023 and that the children had previously always travelled together.

Additionally, the district court's decision to compare the connections that M.A. had formed in Brazil to her connections in the United States in determining habitual residence is supported by this Court's caselaw which recognizes as a relevant consideration the fact that a child has had alternating residences or has moved frequently. *See Jenkins v. Jenkins*, 569 F.3d 549, 557 (6th Cir. 2009) (noting that a comparative analysis is necessary only in cases where children alternative living in different countries for "extended periods and maintained contacts and possessions in each country" (citing *Robert v. Tesson*, 507 F.3d 981 (6th Cir.2007))). The district court properly weighed and compared the connections that M.A. had formed in the United States with her existing connections and relationships previously formed in Brazil.

Accordingly, the district court did not clearly err in determining that M.A.'s habitual residence was in Brazil.

**2. Wrongful Retention**

After determining a child's place of habitual residence, a district court is then required to determine if the child was wrongfully removed to or retained in another country. Retention or removal is considered wrongful if it violates the custody laws of the child's habitual residence. *Monasky*, 140 S. Ct. at 723. Omar argues that the district court erred by determining that Omar's retention of M.A. in the United States was wrongful. Omar argues that because there was no controlling custody order or judicial determination giving sole custody of M.A. to Williane, Omar did not wrongfully retain her by preventing Williane from taking her to Brazil. In the absence of such an order, Omar argues that he has an equal right to determine M.A.'s residence. For support, Omar relies on this Circuit's decision in *Jenkins*, and argues that this case reveals that absent a custody order granting sole custody to the parent who has left the country, the parent who retains a child does not violate the Hague Child Abduction Convention. *See Jenkins*, 569 F.3d at 555.

In *Jenkins*, however, this Court determined that the child's habitual residence was the United States. *Id*. at 557. The father, who prevented the mother from taking the child with her to Israel, had not breached the Convention by retaining the child in the place of her habitual residence, the United States. *Id.* at 555. Such a retention did not breach the mother's right of custody—only the mother's right of access to the child—so the remedy of return was not available. *Id.* at 555 n.3 ("Under the Convention, the remedy of return is available for a wrongful removal or retention but not for a breach of the right to access.").

By contrast, in this case, the district court determined that M.A.'s place of habitual residence is Brazil. Accordingly, this Court must examine Brazilian custody law to determine if a parent may unilaterally retain a child in a different country absent the other parent's consent. *See*

*Douglas v. Douglas*, No. 21-1335, 2021 WL 4286555, at *4 (6th Cir. Sept. 21, 2021) (a retention is wrongful if "it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention" (citing Hague Child Abduction Convention, Article 3)).[6] Brazil's Article 1.634 gives both parents the equal right to determine a child's residence.[7] In the absence of consent from the other parent, the relocation of a child to a different place must be decided by a Brazilian family court.[8] Relocating a child to a different country in the absence of either parental consent or a Brazilian court order can be interpreted as an act of parental alienation subject to various penalties, including modification of the custody arrangement and fines.[9]

Accordingly, Omar unlawfully retained M.A. from her place of habitual residence by preventing Williane from taking her back to Brazil. In the absence of a custody order from a Brazilian court granting him sole custody or the right to relocate M.A.'s residence to the United States, Omar had no right to unilaterally determine that M.A. would reside in the United States.[10]

---

[6] The district court did not independently assess whether the laws of Brazil permit a parent exercising joint custody to unilaterally decide a child's residence. Pursuant to Fed. R. Civ. P. 44.1, this Court may independently research and determine whether Brazil's custody laws permit a parent exercising joint custody to unilaterally relocate a child. *See Abbott v. Abbott*, 560 U.S. 1, 10 (2010) (examining Chilean law to determine that it provided petitioner with a *ne exeat* right to veto child's relocation to a different country); *Jenkins v. Jenkins*, 569 F.3d 549, 554 (6th Cir. 2009) (examining Israeli and Ohio custody laws and determining they were functionally equivalent and that both sets of custody laws presume that both parents have joint custody and a joint right to determine the child's residence).

[7] *See* Marco Aurelio Gerace and Gustavo Antonio Silva, *International relocation of children in Brazil: overview, Practical Law Country Q&A*, Thomson Reuters Practical Law, (Sep. 30, 2018), https://uk.practicallaw.thomsonreuters.com/w-016-9176.

[8] *See id.*

[9] *See id.*; *see also* Eduardo Soares, *Brazil: Parental Alienation Criminalized,* Library of Congress, www.loc.gov/item/global-legal-monitor/2010-09-02/brazil-parental-alienation-criminalized/.

[10] Omar does not cite any provision of either Brazilian (or even Michigan) law that would give him the authority to unilaterally determine M.A.'s residence. Accordingly, the courts of Brazil will have

### 3. Consent Defense

Omar also argues that the district court erred when it determined that Williane had not consented to M.A.'s retention in the United States, adding that the defense of consent is "concerned with a petitioner's actions before the removal or retention of a child from that child's habitual residence." Appellant's Br. at 44. Omar argues that there was sufficient evidence to prove that Williane consented to M.A.'s residence in the United States by agreeing to stay in Michigan for at least a year, by not objecting to the children's enrollment in U.S. schools, and by signing up for English classes in the United States.

Consent is one of the few articulated exceptions to an unlawful retention under the Hague Child Abduction Convention. *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996) (citing Hague Child Abduction Convention, Article 13a). To establish this defense, the respondent must show by a preponderance of the evidence that the petitioner consented to the respondent's retention of the child. *Id.* at 1070 (noting that defense of consent or subsequent acquiescence "requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time").

Although it is true that the defense of consent typically examines the conduct of the party it is invoked against prior to the wrongful removal of a child, courts closely scrutinize the scope of a parent's consent to assess whether it extended to the permanent relocation of a child to a different country. *See e.g., Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir. 2007) (noting "a single

---

jurisdiction to determine the underlying custody dispute. *See Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996) (matters that "go to the merits of the custody dispute . . . are . . . beyond the subject matter jurisdiction of the federal courts").

e-mail message indicating a willingness to allow the children to live with their mother in Ohio should not be the basis for a finding that Mr. Simcox consented to their removal"); *see also Panteleris v. Panteleris*, 601 F. App'x 345, 352 (6th Cir. 2015) (determining that father's consent for children to visit the United States for six months to a year was not consent or acquiescence to children living in the United States permanently).

In this case, the district court did not clearly err in holding that Williane's consent to move to the United States for a temporary period of time was not a form of implicit consent to allowing M.A. to reside in the United States permanently. The district court therefore committed no error in deciding to credit Williane's testimony over Omar's about the fact that Williane had not consented to Omar's retention of the M.A. in the United States. *See Friedrich*, 78 F.3d at 1069 (determining that district court committed no clear error in crediting testimony of father that he did not consent to his son's removal from Germany where there was nothing in the record to suggest that crediting this testimony was wrong and where district court was "faced with a choice as to whom it found more believable in a factual dispute"). Omar has failed to establish by a preponderance of the evidence that Williane consented to permanently relocating M.A. to the United States.

## III. CONCLUSION

Accordingly, we **AFFIRM** the district court's order granting Williane's petition for the return of M.A. pursuant to the Hague Child Abduction Convention.